219 P.3d 1126

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**James MUNDON, Petitioner/Defendant–Appellant.**

**No. 28448.**

Supreme Court of Hawai'i.

Nov. 13, 2009.

---

Stuart N. Fujioka (of Nishioka & Fujioka), Honolulu, for petitioner/defendant-appellant.

Tracy Murakami, Deputy Prosecuting Attorney, for respondent/plaintiff-appellee.

MOON, C.J., NAKAYAMA, J., and Circuit Judge MARKS, in Place of RECKTENWALD, J., Recused; ACOBA, J., concurring and dissenting, separately, with whom DUFFY, J., joins.

Opinion of the Court by MOON, C.J.

On July 1, 2009, this court accepted a timely application for a writ of certiorari, filed on May 21, 2009, by petitioner/defendant-appellant James Mundon, seeking review of the Intermediate Court of Appeals' (ICA) March 20, 2009 judgment on appeal, entered pursuant to its February 27, 2009 summary disposition order (SDO). Therein, the ICA affirmed in part and vacated in part the Circuit Court of the Fifth Circuit's [1] Feb-

---

1. The January 12, 2006 arraignment at which Mundon entered his plea of not guilty was presided over by the Honorable George M. Masuo-

ka. All subsequent proceedings were presided over by the Honorable Kathleen N.A. Watanabe.

ruary 16, 2007 judgment, convicting Mundon of and sentencing him for: (1) one count of attempted sexual assault in the first degree (attempted sex assault 1st), in violation of Hawai'i Revised Statutes (HRS) §§ 707–730(1)(a) (1993)[2] and 705–500 (1993)[3]; (2) one count of terroristic threatening in the first degree (TT1), in violation of HRS §§ 707–715 (1993)[4] and 707–716(1)(d) (1993)[5]; (3) one count of kidnapping, in violation of HRS § 707–720(1)(d) (1993)[6]; (4) one count of assault in the third degree (assault 3d), in violation of HRS § 707–712(1)(a) (1993)[7]; and (5) one count of attempted assault in the second degree (attempted assault 2d), in violation of HRS §§ 707–711 (1993)[8] and 705–500. Oral argument was held on August 10, 2009.

Briefly stated, the charges levied against Mundon (totaling 28–counts) were based on an incident during which Mundon threatened the complaining witness [hereinafter, the complainant] with a knife, forced her to remove her clothes, subjected her to sexual kissing and touching, and, later, tackled and restrained her when she tried to escape. During the pre-trial proceedings, Mundon waived his right to counsel and represented himself at trial with the assistance of standby counsel. Following a six-day jury trial, Mundon was convicted of the above enumerated offenses, and Mundon appealed. The ICA vacated and remanded all of his convictions, except for the attempted sex assault 1st conviction, which the ICA affirmed.

Mundon contends on application that the ICA erred in holding that the trial court did not err in failing to provide a specific unanimity instruction with respect to the charges of attempted sex assault 1st, TT1, and kidnapping. As discussed more fully *infra*, Mundon also contends that the ICA erred in holding that the trial court did not deprive him of his state and federal constitutional rights (1) to due process, confrontation, a speedy trial, and assistance of counsel and (2) to have a jury find the facts necessary for the imposition of a consecutive sentence. Based on the discussion below, we hold that the ICA erred in concluding that: (1) a specific unanimity instruction was not required with respect to the offenses of attempted sex assault 1st and TT1; (2) the trial court's failure to provide Mundon with certain written transcripts was harmless error; and (3) Mundon's constitutional rights were not violated when the trial court refused to continue trial after Mundon complained of his inability to retrieve his trial preparation materials. Accordingly, we reverse Mundon's conviction for TT1, vacate Mundon's remaining convictions, and remand the case for a new trial consistent with this opinion.

2. HRS § 707–730(1)(a) provides that "[a] person commits the offense of sexual assault in the first degree if ... [t]he person knowingly subjects another person to an act of sexual penetration by strong compulsion."

3. HRS § 705–500 provides in relevant part that "[a] person is guilty of an attempt to commit a crime if the person ... [i]ntentionally engages in conduct which, under the circumstances as the ·person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime."

4. HRS § 707–715 provides in relevant part that:

A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:
 (1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

5. HRS § 707–716(1)(d) provides that "[a] person commits the offense of terroristic threatening in the first degree in the first degree if the person commits terroristic threatening ... [w]ith the use of a dangerous instrument."

6. HRS § 707–720(1)(d) provides that "[a] person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to ... [i]nflict bodily injury upon *that person or subject that person to a sexual* offense[.]"

7. HRS § 707–712(1)(a) provides that "[a] person commits the offense of assault in the third degree if the person ... [i]ntentionally, knowingly, or recklessly causes bodily injury to another person[.]"

8. HRS § 707–711 provides in relevant part that "[a] person commits the offense of assault in the second degree if ... [t]he person intentionally or knowingly causes substantial bodily injury to another[.]"

## I. BACKGROUND

### A. Procedural Background

#### 1. Pre–Trial Proceedings

On August 15, 2005, Mundon was charged—via indictment [9]—with: (1) twenty-one counts of sexual assault in the third degree (sex assault 3d), in violation of HRS § 707–732 (Supp.2008); (2) two counts of TT1; (3) one count of attempted sex assault 3d; (4) one count of kidnapping; (5) one count of assault 3d; (6) one count of attempted assault in the first degree (attempted assault 1st), in violation of HRS §§ 707–710 (1993) and 705–500; and (7) one count of attempted sex assault 1st.[10] On January 12, 2006, Mundon entered a plea of not guilty as to all twenty-eight counts. Mundon also indicated that he wished to represent himself at trial and requested the appointment of standby counsel, which the trial court granted, instructing the public defender's office to act as standby counsel. However, due to a conflict of interest reported by the public defender's office, the trial court appointed Alfred B. Castillo as standby counsel for Mundon.

Soon thereafter, on June 7, 2006, Castillo moved to withdraw as Mundon's counsel, which the trial court granted on July 6, 2006, based on Mundon's representation that he was going to hire private counsel. Specifically, Mundon advised the court that he "would like to waive representation from the [c]ourt appointed [attorney] and . . . take over the case [him]self until [he could] purchase an attorney from Oah'u and have that person take over." Ultimately, the trial court, in September 2006, appointed Caren Dennemeyer to act as Mundon's standby counsel based on Mundon, again, indicating his desire to represent himself and requesting appointment of standby counsel. Although Dennemeyer attempted to withdraw as standby counsel on the eve of trial (discussed *infra*), the trial court denied her request.

Between January 2006, when Mundon entered his not guilty pleas, and the commencement of trial on December 11, 2006, the trial court entertained a variety of motions related to (1) Mundon's efforts to secure written transcripts of a February 2004 preliminary hearing [11] and August 15, 2005 grand jury proceeding, (2) speedy trial issues, and (3) Mundon's inability to obtain his trial preparation materials that were left behind on O'ahu when he was transferred to Kaua'i for trial four days early. The factual background related to these matters are presented in the applicable sections *infra*.

#### 2. Jury Trial

Mundon's jury trial commenced on December 11, 2006 and lasted six days. The prosecution's case in chief consisted of, *inter alia,* the testimonies of the complainant, Kaua'i Police Department (KPD) Detective Marvin Rivera (Det. Rivera), and six other members of the KPD. Mundon also testified on his own behalf, relating a version dramatically different from the complainant's version of the events that occurred on the night in question.

##### a. the complainant's testimony

The complainant testified that, on Febru-

---

**9.** Mundon was originally charged—via complaint—on February 9, 2004. However, all the charges were dismissed without prejudice on August 24, 2004, pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 48(b) (2009), quoted *infra*, due to pre-trial delay. After the February 9, 2004 charges were dismissed, Mundon was released from custody. Thereafter, the prosecution moved for a revocation of probation (apparently based on a prior offense for which he was sentenced to probation) and, on January 14, 2005, Mundon was re-sentenced to five years of imprisonment. Thus, when he was indicted on August 15, 2005, he was incarcerated and remained in prison for the duration of the instant proceedings.

**10.** As indicated *infra*, Mundon was charged with attempted assault 1st, in violation of HRS § 707–710, and the jury was instructed as to that offense as well as the lesser included offense of attempted assault 2d pursuant to HRS § 707–711. Mundon was ultimately convicted of the lesser included offense of attempted assault 2d.

**11.** As previously noted, Mundon was originally charged with the aforementioned offenses in 2004, but these charges were dismissed without prejudice due to pre-trial delay. *See supra* note 9.

ary 4, 2004 at around 10:00 p.m.,[12] she encountered Mundon at Kapaʻa Beach on Kauaʻi. She started a conversation with Mundon and told him that her friend "Tito"[13] had gone to a nearby hotel to see if rooms were available because they were both looking for a place to stay for the night. Mundon offered to try to find them a cheap hotel and told the complainant that she could sleep in the cab of his truck while she was waiting for Tito because it was warmer. The complainant fell asleep in the cab of the truck, and, when she woke up, Mundon told her he had found a place for her to stay and drove to a spot by the ocean somewhat near a hotel where Mundon claimed they were supposed to meet Tito.

After some time passed, Tito did not show up, and the complainant asked Mundon to take her back to Kapaʻa Beach. The complainant again fell asleep in the truck; when she awoke, she realized they were not at Kapaʻa Beach, but in a dark, secluded area on the other side of the hotel. Mundon parked the truck, got out, and told the complainant that he was going to see if he could find Tito or a security guard at the hotel. When Mundon returned, he told the complainant that no one was around. Mundon left again to look for Tito, and the complainant fell asleep.

Some time later, the complainant felt something touching her leg and awoke to find Mundon putting his hand underneath her underwear, near her outer labia or pubic area. She told Mundon to stop; after Mundon stopped and apologized, she went back to sleep. When she awoke, she again found Mundon putting his hand in her underwear and feeling her outer labia. Mundon complied with her request to stop and again apologized, and the complainant went back to sleep. When the complainant awoke for a third time and felt Mundon touching her, she tried to get out of the truck. However, before she could exit the vehicle, Mundon grabbed her and said, "Don't move. I have a

knife. It[']s up to your neck, and I'll cut you if you try and get away." The complainant did not see the knife, but felt something cold and sharp along the front of her neck.

Mundon told her to relax and put the knife down, but reminded her that he would cut her if she did not do what he wanted. He next told the complainant to remove her clothes. The complainant complied and removed almost all of her clothing. Mundon then began touching and kissing the complainant's breasts, doing so on each breast approximately ten to fifteen times. Mundon also told the complainant to touch his penis, but she refused. At one point, Mundon stated to the complainant that, because she probably would tell the police about the incident, it would be easier to kill her and proceeded to retrieve rope and tape from his glove compartment. At that point, the complainant panicked and, in an attempt to get out of the truck, told Mundon that she needed to use the bathroom. Although reluctant at first, Mundon eventually allowed her to exit on the driver's side to use the bathroom. When she was done, the complainant hurriedly got back into the truck through the driver's side, quickly exited on the passenger's side, and began running away. Mundon gave chase, caught up with her, and tackled her to the ground with the complainant ending face down in the sand. A struggle ensued.

During the struggle, the complainant saw that Mundon had the knife in his hand, although it was "closed," and she started to scream. Mundon continued to hold her down on the ground and attempted to silence her by sticking his fingers and quantities of sand down her throat while repeatedly telling her to shut up. The complainant bit Mundon's fingers and continued to try to push him off her. At one point, Mundon punched the complainant hard in the ribs. Eventually, the complainant stopped struggling when she noticed that Mundon seemed extremely winded and sick. She then told Mundon that

12. Inasmuch as the incident in question began on the night of February 4, 2004 but went past midnight and into the next morning, many of the specific events about which the complainant testified took place on February 5, 2004.

13. During a pre-trial hearing, "Tito" was identified as Felix Guzman, who lived on Kauaʻi. At trial, Mundon testified that he had seen Tito before, but stated that he "d[idn't] know him well."

she was not going to leave. At that point, Mundon let go of her, and the complainant ran toward the hotel in the distance. Upon reaching the hotel, the complainant banged on the door of a hotel room, and the occupants of the room let her in and called 911. When the police arrived, the complainant gave them a detailed description of Mundon, drew a sketch of Mundon's truck, and briefly described the events that had occurred. She also accompanied the police to the area around the hotel, where she was able to positively identify the location where each of the events had taken place.

### b. *testimonies of law enforcement officers*

The prosecution also called Det. Rivera, who testified that he was assigned as the lead investigator on the complainant's case and that his duties included taking the complainant to the location of the incident, as well as searching Mundon's truck, which was later found at Mundon's home. Det. Rivera corroborated the complainant's testimony regarding the location of the truck, the area where the struggle occurred, and the location of the nearby hotel. He also testified that he found the complainant's clothes, the knife, the rope, and the tape in the truck.

Other KPD officers testified and corroborated the complainant's testimony as to the location of the truck and the area where the struggle had occurred. The officers also corroborated the complainant's description of Mundon's truck.

### c. *Mundon's testimony*

Mundon was the sole witness for the defense. Mundon testified that, after he parked the truck at the beach, he went to check out the hotel, but left his keys, telephone, and a light on for the complainant. He took a long walk toward the hotel, but, because he did not see anybody (including Tito), he returned to the truck and told the complainant it was late and that he needed to leave. He offered to take the complainant back to Kapa'a and said that he would give her some time to "get [her]self put together." Mundon claimed that, at that point, the complainant indicated she had to use the bath-

room and wanted to change her clothes. Mundon, therefore, gave her a towel, pointed her to a place where she could go, and decided to take a walk to give her some time to change and "get her stuff together."

Upon returning to his truck, he saw smoke coming from inside and became upset because it was a company truck, and he did not want it to get messed up. He confronted the complainant regarding the smoke, noticed that she was not fully clothed, told her she better put her clothes on, and said "get the 'F' out of here before I fly you out of this car." He slammed the door on her, turned around, and walked away from the truck because he was mad. After a few moments, he heard the truck door open, then close, and turned around to see the complainant coming toward him. He grabbed her face and her backpack and threw her to the ground, causing both of them to fall down. He then noticed that the complainant had his knife in her hand and jumped on top of her in an attempt to wrestle the knife away from her. The complainant continuously kicked him, but he continued to hold her down. Eventually, the complainant dropped the knife and ran away. Feeling very sick, Mundon picked up the knife, walked back to his truck without looking to see where the complainant had gone, and drove home. Upon arriving at home, he fell asleep in his truck and was awakened by police officers who placed him under arrest.

### d. *jury's verdict*

The jury returned its verdict on December 20, 2006, finding Mundon guilty of (1) one count of attempted sex assault 1st, (2) one count of TT1, (3) one count of kidnapping, (4) one count of assault 3d, and (5) the lesser included offense of attempted assault 2d. Mundon was acquitted of all of the remaining charges, including the second count of TT1, discussed *infra.*

### 3. Sentencing

Mundon was sentenced on February 15, 2007. After hearing arguments from both parties, the trial court sentenced Mundon to, *inter alia:* (1) twenty years of imprisonment for each of the counts of kidnapping and

attempted sex assault 1st; (2) five years for one count of TT1 and one count of attempted assault 2d; and (3) one year for assault 3d. The trial court ordered all terms to run concurrently with each other, except for the twenty-year sentence for attempted sex assault 1st, which the trial court ordered to run consecutively. The trial court indicated that the imposition of Mundon's consecutive sentence was based on the severity of the charges, Mundon's prior record, the recommendations made by the prosecution, Mundon's and Dennemeyer's statements to the trial court, and various other written statements received by the trial court. The judgment of conviction and sentence was filed on February 16, 2007. On March 14, 2007, Mundon timely filed a notice of appeal, appearing *pro se*.[14]

### B. *Appeal Before the ICA*

On direct appeal, Mundon contended that the trial court violated his constitutional right to due process when it failed to provide the jury with a unanimity instruction as to the charges of assault 3d, attempted sex assault 1st, TT1 and kidnapping. Mundon further argued that the trial court: (1) violated his due process and confrontation rights when it failed to provide him with the written transcripts he had requested; (2) violated his due process rights by refusing to continue the trial even though he was without his trial preparation materials at the start of trial; (3) erred in denying his motion to dismiss the charges despite violations of his constitutional right to a speedy trial and HRPP Rule 48[15]; (4) prevented him from speaking with his standby counsel during a trial recess, in violation of his constitutional right to the assistance of counsel; and (5) violated his constitutional right to have a jury find the facts necessary for the imposition of a consecutive sentence.

14. On April 11, 2007, Mundon requested the appointment of appellate counsel. On April 24 and 26, respectively, the trial court granted Mundon's request and appointed Stuart Fujioka to represent Mundon on appeal.

15. HRPP Rule 48 provides in relevant part that "the court shall, on motion of the defendant,

In response, the prosecution essentially argued that a specific unanimity instruction was not required because the prosecution either (1) elected the single act that supported the conduct element of the offenses as required by *State v. Arceo*, 84 Hawai'i 1, 928 P.2d 843 (1996), discussed *infra*, or (2) proved that the offense constituted a continuing course of conduct. Further, the prosecution argued that Mundon's constitutional rights were not violated because: (1) although Mundon was entitled to written transcripts, he failed to show that he was prejudiced by the trial court's failure to provide them; (2) the trial court properly refused to continue the trial as Mundon had ample time to prepare his defense; (3) Mundon's motion to dismiss based on speedy trial grounds was properly denied; (4) Mundon did not have a constitutional right to speak with his standby counsel during cross-examination; and, (5) pursuant to *State v. Kahapea*, 111 Hawai'i 267, 141 P.3d 440 (2006), jury fact-finding was not required for the imposition of consecutive sentences.

As discussed more fully *infra*, the ICA rejected all of Mundon's contentions, except it agreed with Mundon that he was entitled to a unanimity instruction with respect to the charge of assault 3d. SDO at 3–7. Additionally, the ICA *sua sponte* held that "it is possible that Mundon's convictions" for kidnapping, TT1, attempted assault 2d, and assault 3d were "improperly based on the same conduct and[,] thus[,] warranted a merger instruction to the jury. *See* HRS § 701–109(1) and (4) (1993)." *Id.* at 7 (other citations omitted). Consequently, the ICA vacated the four aforementioned convictions and remanded with instructions that the prosecution shall have the option to: (1) either (a) dismiss the TT1 or the kidnapping offense, or (b) retry Mundon on both counts, with an appropriate merger instruction given to the jury; and (2) either (a) dismiss the assault 3d or the attempted assault 2d of-

dismiss the charge, with or without prejudice in its discretion, if trial is not commenced within [six] months ... from the date of re-arrest or refiling of the charge, in cases where an initial charge was dismissed upon motion of the defendant[.]"

fense, or (b) retry Mundon on both counts, with an appropriate merger instruction given to the jury. *Id.* (citing *State v. Padilla,* 114 Hawai'i 507, 517, 164 P.3d 765, 775 (Hawai'i App.2007)).

The ICA filed its judgment on appeal on March 20, 2009. Thereafter, this court accepted Mundon's application on July 1, 2009 and heard oral argument on August 10, 2009.

## II. STANDARDS OF REVIEW

### A. Questions of Constitutional Law

■ "[This court] review[s] questions of constitutional law under the 'right/wrong' standard" and, thus, "exercises [its] own independent judgment based on the facts of the case." *State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations omitted).

### B. Jury Instructions

■ When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. However, error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled.

*State v. Nichols,* 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006) (format altered) (citations and internal brackets omitted).

### C. Sentencing

■ A sentencing judge generally has broad discretion in imposing a sentence. The applicable standard of review for sentencing or resentencing matters is whether the court committed plain and manifest abuse of discretion in its decision. Factors which indicate a plain and manifest abuse

of discretion are arbitrary or capricious action by the judge and a rigid refusal to consider the defendant's contentions. And, generally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*State v. Kahapea,* 111 Hawai'i 267, 278, 141 P.3d 440, 451 (2006) (citing *State v. Rauch,* 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000)) (format altered) (other citations, internal quotation marks, and brackets omitted).

## III. DISCUSSION

As previously stated, Mundon challenges the ICA's holdings that: (1) no unanimity instruction was required with respect to the charges of attempted sex assault 1st, TT1, and kidnapping; (2) the trial court did not violate Mundon's constitutional rights when it (a) failed to provide him with the written transcripts of pre-trial proceedings that he had repeatedly requested, (b) refused to continue the trial when Mundon complained of his inability to retrieve his trial preparation materials, (c) rejected Mundon's motions based on non-conformities with the rules of court that improperly delayed the trial, and (d) prevented Mundon from consulting with his standby counsel during a fifteen-minute break in his cross-examination; and (3) Mundon was not denied his constitutional right to have a jury find the facts necessary for the imposition of a consecutive sentence.

### A. Unanimity Jury Instructions

The jury was instructed on all charges, including the lesser included offense of sex assault 2d. With regard to the twenty-one counts of sex assault 3d, the jury was instructed as to the specific conduct that formed the basis for each individual count.[16] However, the jury was not instructed as to the specific conduct that formed the basis for the remaining offenses.

On direct appeal, the ICA held, *inter alia,* that "no unanimity instruction was required

---

16. Specifically, the twenty-one counts of sex assault 3d were based on either Mundon's touching of the complainant's breasts, kissing of the com-

plainant's breasts, or Mundon's touching of the complainant's genitals.

for the attempted [sex assault 1st] and kidnapping charges against Mundon because these offenses were supported by evidence of a *continuous course of conduct over a period of time. See State v. Apao*, 95 Hawai'i 440, 450, 24 P.3d 32, 42 (2001); and *State v. Sabog*, 108 Hawai'i 102, 114–15, 117 P.3d 834, 846–47 (App.2005)." SDO at 6 (emphasis added). The ICA also held that "no unanimity instruction was required as to the two [TT1] charges because the [prosecution] adduced proof of two separate and distinct culpable acts of [TT1] and charged Mundon with two counts of [TT1]." *Id.*

On application, Mundon maintains that a unanimity instruction was required for each offense because: (1) "[f]or unanimity purposes, it would prove anomalous to treat a series of attempted sexual assaults as a continuing course of conduct, while each successful sexual assault is considered a separate criminal act," citing *Apao*, 95 Hawai'i at 446, 24 P.3d at 38; (2) the jury found Mundon guilty of only one count of TT1 and, "[w]ithout a unanimity instruction[,] it is impossible to know what he was convicted of"; and (3) the prosecution adduced evidence of more than one act that could have constituted kidnapping.

Preliminarily, we recognize that Mundon did not raise a timely objection to the trial court's failure to provide a unanimity instruction or to the prosecution's failure to elect a specific act. However, we have held that it "may recognize plain error when the error committed affects substantial rights of the defendant." *Arceo*, 84 Hawai'i at 33, 928 P.2d at 875 (internal brackets and ellipses omitted). We have also stated that "it may be plain error for a trial court to fail to give a [jury] instruction even when neither the prosecution nor the defendant have requested it ... because ... *the ultimate responsibility properly to instruct the jury lies with the [trial] court." State v. Kinnane*, 79 Hawai'i 46, 50, 897 P.2d 973, 977 (1995) (emphasis added); *see also Arceo*, 84 Hawai'i at 33, 928 P.2d at 875 (holding that the trial court plainly erred in failing to provide a specific unanimity instruction to the jury).

It is well-settled that "the right of an accused to a unanimous verdict in a criminal prosecution, tried before a jury in a court of this state, is guaranteed by article I, [sections] 5 and 14 of the Hawai'i Constitution." *Arceo*, 84 Hawai'i at 30, 928 P.2d at 872. In *Arceo*, we held that,

> when separate and distinct culpable acts are subsumed within a single count charging a sexual assault—any one of which could support a conviction thereunder— and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated unless one or both of the following occurs: (1) *at or before the close of its case-in-chief, the prosecution is required to elect the specific act upon which it is relying to establish the "conduct" element of the charged offense;* or (2) *the trial court gives the jury a specific unanimity instruction, i.e.,* an instruction that advises the jury *that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt.*

*Id.* at 32–33, 928 P.2d at 874–75 (emphases added). We further concluded that,

> [a]lthough *Arceo* was concerned with sexual assault, the requirement expressed therein has been discussed in cases involving a variety of offenses where multiple acts and jury unanimity were at issue. Moreover, according to *[State v.] Valentine*, [93 Hawai'i 199, 208, 998 P.2d 479, 488 (2000) ], two conditions must converge before an *Arceo* unanimity instruction, absent an election by the prosecution, is necessary: (1) at trial, the prosecution adduces proof of two or more separate and distinct culpable acts; and (2) the prosecution seeks to submit to the jury that only one offense was committed.

*State v. Kassebeer*, 118 Hawai'i 493, 508, 193 P.3d 409, 424 (2008) (emphasis added) (internal citations omitted).

However, "a specific unanimity instruction is not required if (1) the offense is not defined in such a manner as to preclude it from being proved as a continuous offense and (2) *the prosecution alleges, adduces evidence of, and argues that the defendant's action constituted a continuous course of conduct." State v. Apao*, 95 Hawai'i 440, 447,

24 P.3d 32, 39 (2001) (emphasis added). Keeping the foregoing principles in mind, we now turn to address the propriety of a unanimity instruction with regard to kidnapping, attempted sex assault 1st, and TT1.

### 1. Kidnapping

As previously noted, "[a] person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to ... [i]nflict bodily injury upon that person or subject that person to a sexual offense[.]" HRS § 707–720(1)(d). " 'Restrain' means to restrict a person's movement in such a manner as to interfere substantially with the person's liberty ... [b]y means of force, threat, or deception[.]" HRS § 707–700 (1993). Mundon contends that a unanimity instruction was required with respect to the kidnapping charge inasmuch as the prosecution adduced evidence of more than one act of restraint that could have constituted kidnapping. We disagree.

■ Here, nothing in the statutory definition of kidnapping precludes the prosecution from proving that the restraint was accomplished by a series of acts constituting a continuing course of conduct. Indeed, we have previously stated that "[i]t is not difficult to imagine a series of threats and coercive conduct that might be employed to sustain a kidnapping ... over a period of time" and, "under certain circumstances, kidnapping would be an example of a continuing offense." *Apao*, 95 Hawai'i at 448, 24 P.3d at 40 (citing *Arceo*, 84 Hawai'i at 18, 928 P.2d at 860). Further, the ICA has recognized that, based on this court's decision in *Apao*, "it is evident that[,] where a series of threats and coercive conduct are employed to sustain a kidnapping over a period of time, a court is not required to give a specific unanimity instruction." *Sabog*, 108 Hawai'i at 114, 117 P.3d at 846. Thus, if the prosecution presented evidence at trial that the kidnapping occurred as a result of one continuous, uninterrupted course of conduct, no specific unanimity instruction was required. *Apao*, 95 Hawai'i at 446, 24 P.3d at 38.

■ At trial, the evidence showed that Mundon held a knife up to the complainant's throat and threatened to "cut her" if she tried to get out of his truck. Although Mundon put down the knife prior to ordering the complainant to remove her clothes, he continued to threaten her by saying he would cut her if she did not comply with his instructions. At one point, Mundon allowed the complainant to get out of the truck to use the bathroom. The complainant then ran, but Mundon—with knife in hand (although the knife was in a closed position)—caught up to her and tackled her in the sand. While struggling with the complainant in the sand, Mundon repeatedly shoved his fingers and sand into her mouth and punched her in the ribs. The prosecution maintained during closing argument that

> [t]his is what the [prosecution] has to prove beyond a reasonable doubt. That on or about the 5th day of February 2004 in the County of Kaua'i, State of Hawai'i, [Mundon] restrained another person. *[Mundon] restrained [the complainant]. He did it in a number of ways: With a knife, by tackling her, he restrained her.*

(Emphases added.)

Based on the evidence adduced at trial, we conclude that, from the time that Mundon threatened the complainant with a knife in the truck until the time that she escaped from the struggle in the sand, Mundon was restricting her movement and substantially interfering with her liberty. Indeed, the evidence demonstrates that Mundon's specific acts, *i.e.*, repeatedly threatening the complainant, chasing her when she tried to flee, and forcibly tackling her into the sand, constituted multiple instances of threats and force committed to accomplish the singular goal of restraining the complainant. Thus, it is apparent that Mundon's continuous act of restraint (by threats and coercive conduct) was uninterrupted. Furthermore, the prosecution's argument that "Mundon restrained the complainant [and that he] did it in a number of ways: With a knife, by tackling her, he restrained her" demonstrates its view that Mundon engaged in a series of acts constituting a continuous course of conduct—*not* separate and distinct instances of kidnapping, as Mundon contends.

Based on the foregoing, we conclude that the prosecution "allege[d], adduce[d] evidence of, and argue[d] that the defendant's action[s] constituted a continuous course of conduct" with respect to the kidnapping offense. *Apao*, 95 Hawai'i at 447, 24 P.3d at 39. Consequently, we hold that a specific unanimity instruction was not required and, as such, the ICA did not err in making the same determination.

## 2. Attempted Sexual Assault in the First Degree

 As previously indicated, Mundon contends that, because each "sexual assault is considered a separate criminal act," the trial court should have given a unanimity instruction as to attempted sex assault 1st. For the reasons discussed below, we hold that a specific unanimity instruction was required.

Mundon was charged with a single count of attempted sex assault 1st. "A person commits the offense of sexual assault in the first degree if . . . [t]he person knowingly subjects another person to an act of sexual penetration by strong compulsion." HRS § 707–730(1)(a). Further, "[a] person is guilty of an attempt to commit a crime if the person . . . [i]ntentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime." HRS § 705–500.

At trial, the evidence showed that Mundon stuck his hand in the complainant's underwear and touched her outer labia three times. Each time the complainant tried to "wriggle away" or asked him to stop, Mundon immediately stopped and apologized. Later, however, Mundon—while holding a knife to the complainant's throat—threatened to cut her if she tried to escape. After ordering the complainant to remove her clothes, he began kissing and touching her breasts with his hands "going everywhere."

During closing argument, the prosecution explained: "Attempted sexual assault in the first degree: This is [Mundon] trying to penetrate [the complainant] with his fingers. *He kept trying.* She kept wiggling. *He kept trying.* It[']s the first step to the act of penetration with his fingers." (Emphases added.)

The evidence and the reasonable inferences therefrom established that Mundon made three separate attempts to subject the complainant to an act of sexual penetration based upon the complainant's testimony that Mundon put his hand in her underwear *three times,* touching her outer labia, and, after each time, Mundon stopped and apologized. The prosecution's closing argument that Mundon "kept trying" and that the complainant "kept wiggling," trying to get away, confirms the prosecution's view that it considered Mundon's acts as multiple, separate attempts to penetrate the complainant with his fingers—not a continuing course of conduct. Further, the prosecution's statement during closing argument that "it[']s the first step to the act of penetrating the complainant with his fingers" supports the conclusion that the prosecution viewed each "touching" as the first step of three separate attempts to penetrate the complainant with his fingers—again, not a continuing course of conduct.

Nevertheless, even if the foregoing argument can be interpreted as demonstrating the prosecution's view that Mundon's separate acts were committed as part of a single, continuing course of conduct, we have held that

sexual assault in the first degree, in violation of HRS § 707–730(1)(b), and sexual assault in the third degree, in violation of HRS § 707–732(1)(b), *are not—and cannot be—"continuing offenses" and that each distinct act in violation of these statutes constitutes a separate offense under the [Hawai'i Penal Code].* Were this not the case, a person who has committed one sexual assault upon a victim could commit with impunity many other such acts during the same encounter, and the commission of one act would insulate the perpetrator from further criminal liability for any additional acts of the same character perpetrated on the same [victim] in subsequent encounters.

*Arceo*, 84 Hawai'i at 21–22, 928 P.2d at 863–64 (emphasis added) (internal citations, some

internal quotation marks, brackets, and ellipsis omitted). Moreover, in *Apao,* we concluded that "the definition of sexual assault *precluded the consideration of separate acts of penetration as a continuing course of conduct*[.]" *Apao,* 95 Hawai'i at 446, 24 P.3d at 38 (citing *Arceo,* 84 Hawai'i at 30–33, 928 P.2d at 872–75) (emphasis added).

Accordingly, even if the prosecution's closing argument is disregarded, we conclude that, given the foregoing propositions of law and the evidence adduced at trial, Mundon's multiple attempts to penetrate the complainant with his fingers cannot constitute a continuing course of conduct and must be considered as separate and distinct acts. Thus, it was plain error for the trial court not to issue a specific unanimity instruction with respect to the attempted sex assault 1st charge and that the ICA erred in holding otherwise.

### 3. Terroristic Threatening in the First Degree

The prosecution argued to the jury that there were

*[t]wo huge instances* in this case where [Mundon] threatened [the complainant]. *First, in the truck with the knife.* A threat doesn't have to be a verbal threat—although in this case he was saying, "I'm going to cut you. I'm going to cut you."

It can also be a threat by conduct. Holding a knife to someone's throat is threatening. That happened in the truck. *There's two counts of [TT1] in this case because the other place it happened was in the sand when they [we]re struggling over the knife.*

Another threat: She was terrified of that knife while she was in the sand and she was trying desperately so he couldn't open that knife by yelling repeatedly.

As previously indicated, Mundon contends that, although he was charged with two counts of TT1, "the jury found [him] guilty of only one count ... and, [w]ithout a unanimity instruction[,] it is impossible to know what he was convicted of." In other words, Mundon appears to assert that, although a separate and distinct culpable act served as the basis for each separate count of TT1, each distinct

act was not associated with a *specific TT1 count.* Thus, without a unanimity instruction, it is impossible to presume that the one finding of guilty by the jury was, in fact, based on the same culpable act and agreed upon by all twelve jurors.

At first blush, it would seem that, under *Arceo,* a unanimity instruction would not be required inasmuch as Mundon was charged with *two counts* of TT1 based on two separate and distinct culpable acts. *Arceo,* 84 Hawai'i 1, 928 P.2d 843 (requiring unanimity if the prosecution adduces evidence of two separate acts but submits to the jury that *only one offense was committed* ). However, the *Arceo* court referred to a line of federal decisions that recognized that the jury should be given a specific unanimity instruction under additional circumstances. *Id.* at 32, 928 P.2d at 874.

For example, in *United States v. Echeverry,* 719 F.2d 974 (9th Cir.1983), the United States Court of Appeals for the Ninth Circuit held that:

In a routine case when a jury is presented with multiple counts or schemes, it may be possible to protect the defendant's right to an unanimous jury verdict by ... a general [unanimity] instruction. When it appears, however, that there is *a genuine possibility of jury confusion or that a* **conviction may occur as the result of different jurors concluding that the defendant committed different acts,** the general unanimity instruction does not suffice. To correct any potential confusion in such a case, the trial judge must augment the general instruction *to ensure the jury understands its duty to* **unanimously agree to a particular set of facts.**

*Id.* at 974–75 (emphases added); *see also United States v. Payseno,* 782 F.2d 832 (9th Cir.1986) (vacating the defendant's conviction for extortion and remanding for a new trial because the evidence connecting the defendant to the alleged threats created confusion for the jury regarding the basis for his conviction). Further, the Ninth Circuit has held that, "where the indictment is sufficiently broad and ambiguous so as to present a danger of jury confusion," a specific unanimi-

ty instruction is required. *United States v. Anguiano*, 873 F.2d 1314, 1319 (9th Cir. 1989), *cert. denied*, 493 U.S. 969, 110 S.Ct. 416, 107 L.Ed.2d 381 (1989).

Additionally, the ICA, in *State v. Auld*, 114 Hawai'i 135, 157 P.3d 574 (App.2007), acknowledged and applied the Ninth Circuit's holding in *Echeverry*. In *Auld*, the defendant was charged with two counts of TT1. 114 Hawai'i at 136, 157 P.3d at 575. At trial, the prosecution adduced evidence of several persons that the defendant had threatened, as well as multiple acts by the defendant, that served as the basis for the two counts of TT1. *Id.* at 136–37, 157 P.3d at 575–76. No specific unanimity instruction was given with respect to which persons were threatened in which count, and the jury convicted the defendant on both counts of TT1. *Id.* at 136, 138, 157 P.3d at 575, 577. The defendant appealed, arguing that, although a specific unanimity instruction was given with respect to the *acts* committed by the defendant, the jury should have been given a unanimity instruction as to "*the individual(s) who was/ were the victim[ (s) ]*." *Id.* (emphasis added). The ICA agreed, holding that a similar instruction should have been given to the jury "*as to the persons threatened*." *Id.* at 142, 157 P.3d at 581. More specifically, the ICA stated that, because both the indictment and jury instructions identified four possible victims and there was no instruction requiring unanimity as to the persons threatened,

> each of the twelve jurors could have based his or her determination of guilt on a finding of [seven] victim alternatives.... Allowing each juror seven choices and not requiring all jurors to agree on no less than one violates the rule requiring a unanimous jury regarding the persons threatened, which was necessary to prove the offense charged.

*Id.* at 143–44, 157 P.3d at 582–83. In other words, because there was a possibility that the conviction resulted from different jurors concluding that the defendant committed a specific act, but with respect to different persons, there was no way to determine whether the jury produced a unanimous verdict with respect to the person or persons against whom each crime was committed.

Consequently, the ICA vacated both counts of TT1 and remanded for a new trial with instructions to provide the jury with a specific unanimity instruction as to the person(s) threatened for each count. *Id.* at 145, 157 P.3d at 584.

 Here, Mundon was charged with two counts of TT1 (counts 4 and 26), but convicted of only count 4. The language of the indictment as to each count was identical and stated as follows:

> On or about the 5th day of February, 2004, in the County of Kaua'i, State of Hawai'i, [Mundon], with intent to terrorize or in reckless disregard of the risk of terrorizing [the complainant], did threaten by word or conduct to cause bodily injury to said [the complainant] with the use of a dangerous instrument, to wit: a knife, thereby committing the offense of [t]erroristic [t]hreatening in the [f]irst [d]egree in violation of [§§ ]707–715 and 707–716(1)(d) of the [HRS].

During the trial, the prosecution adduced evidence of two separate acts of TT1 and argued that there were "two huge instances" of TT1—one "in the truck with the knife" and the other "in the sand when [Mundon and the complainant we]re struggling over the knife." Although the jury heard evidence regarding two "huge instances" of TT1, the jury was never informed as to which act served as the basis for which count of TT1. Indeed, the record reflects that the prosecution never elected which specific act served as the basis for each individual count of TT1.

Because the jury: (1) was not given a specific unanimity instruction with respect to the offense of TT1; (2) was *never informed which act committed by Mundon coincided with counts 4 and 26, respectively;* and (3) convicted Mundon of one count of TT1 and acquitted him of the other, there is a "genuine possibility" that different jurors concluded that Mundon committed different acts. In other words, it is possible that some jurors concluded that Mundon committed TT1 when he used the knife in the truck and others concluded that Mundon committed such offense when Mundon and the complainant were struggling with the knife in the

sand. Thus, there may not have been a unanimous verdict as to Mundon's conviction for TT1. Accordingly, we hold that, to "correct any potential confusion" in this case, a specific unanimity instruction should have been given "to ensure [that] the jury underst[ood] its duty to unanimously agree to a particular set of facts," *Echeverry*, 719 F.2d at 975, and that the trial court plainly erred in failing to provide such an instruction. However, unlike in *Auld*, where the defendant was convicted of both counts of TT1 and the case remanded for a new trial on both counts, Mundon's conviction on one of the TT1 counts and acquittal on another (where the specific act supporting each count was never specified) raises double jeopardy concerns.

 "Double jeopardy protects individuals against: (1) a second prosecution for the same offense after acquittal; [and] (2) a second prosecution for the same offense after conviction[.]" *State v. Higa*, 79 Hawai'i 1, 5, 897 P.2d 928, 932 (1995). "That a jury's verdict of acquittal bars a subsequent retrial on those same offenses is 'perhaps the most fundamental rule in the history of double jeopardy jurisprudence.'" *Stow v. Murashige*, 389 F.3d 880, 888 (9th Cir.2004) (citing *United States v. Martin Linen Supply, Co.*, 430 U.S. 564, 571, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977)) (internal brackets omitted).

 Assuming for purposes of this double jeopardy analysis that the TT1 conviction was based upon a unanimous agreement by the jury on the same culpable act, Mundon's count 4 conviction could have been based on his act of threatening the complainant in the truck with the knife or upon his act of struggling with the complainant in the sand with the knife. Similarly, the TT1 acquittal could have been based on either of Mundon's acts. However, because each specific act was not assigned to a specific count, *there is no way to know which specific act served as the basis for the jury's conviction of Mundon on count 4 and which act served as the basis for Mundon's acquittal on count 26.* As a result, we conclude that, by remanding Mundon's count 4 conviction for retrial, there is a distinct possibility that Mundon could be retried for an offense in-

volving the same conduct for which he was acquitted. Such possibility would violate Mundon's double jeopardy rights because "the most fundamental rule in the history of double jeopardy," *Stow*, 389 F.3d at 888, is that a defendant shall not be retried for the same offense. Consequently, we are compelled to reverse Mundon's count 4 conviction for TT1.

### B. *Written Transcripts*

Between July 14, 2006 and July 21, 2006, Mundon filed five motions seeking various relief from the trial court, one of which sought the written transcripts of the February 2004 preliminary hearing and the August 15, 2005 grand jury proceeding. However, the trial court rejected all of Mundon's motions without prejudice because of a variety of non-conformities with the rules of court.

On October 24, 2006, Mundon re-filed his motion requesting written transcripts of the February 2004 preliminary hearing and the August 15, 2005 grand jury proceeding [hereinafter, collectively, the written transcripts]. On October 26, 2006, a hearing was held, at which the following exchange took place between the trial court, Mundon, and Mundon's standby counsel (Dennemeyer):

THE COURT: So, Mr. Mundon, we— basically, we just have your motion for transcripts. And[,] as Ms. Dennemeyer well knows, all that it requires is that a form be filled out and all of the proceedings in this courtroom, or in any of the courtrooms in this courthouse, can be provided to you by way of CD. Okay.

So, Ms. Dennemeyer, you will assist Mr. Mundon then in filling out the appropriate forms[.]

. . . .

MS. DENNEMEYER: I have another question on that matter. He was speaking of a DVD, I take it. I would like the [trial c]ourt to ask him if he has the ability to play it.

THE COURT: These will be CDs, compact disks.

[Mundon]: I won't be able to. I won't be able to play it.

THE COURT: You don't have the device to play it?

[Mundon]: No.

THE COURT: Okay. Ms. Dennemeyer.

MS. DENNEMEYER: It would sound like he would need a written transcript then.

[Mundon]: Yes, yes.

THE COURT: Well, the problem is we don't provide written transcripts in the ordinary course. There is a special procedure. It's going to take a lot of time. The [trial c]ourt really doesn't have any control over the time frame on that.

MS. DENNEMEYER: I understand that, Judge. I know how long it takes to get a transcript, but I don't know what the alternative would be.

THE COURT: Ms. Dennemeyer, given that you are standby counsel, do you have the means by which you can provide [sic] to Mr. Mundon so that he can review the CDs?

MS. DENNEMEYER: No. I don't have a laptop or anything like that.

THE COURT: All right. Then, logistically, that issue is going to have to be worked out between you and Mr. Mundon, Ms. Dennemeyer.

*But the [trial c]ourt is granting the request for copies of the CDs. This is to be treated no differently than any other request that comes into this [trial c]ourt.* And, again, you know, other than that, it is the logistics just need to be worked out.

MS. DENNEMEYER: Just so you know, Judge, the only alternative I can see is me requesting the transcripts, sending off, and that's going to be a delay. *So if he really wants the transcripts, which he is certainly entitled to, I don't see how it can be done in time for the trial. That's the first obstacle that I can foresee.*

THE COURT: That's correct. And we have a firm [date] set on this trial [ (December 11, 2006) ].

. . . .

MS. DENNEMEYER: I will speak to Mr. Mundon and see how he wants to work it out. And I guess we'll get back to that. (Emphases added.)

As previously stated, Dennemeyer filed a motion to withdraw as Mundon's standby counsel on December 4, 2006. Therein, Dennemeyer stated, *inter alia*, that, because Mundon had not been provided with the written transcripts, "there is no way Mundon c[ould] fully prepare his defense at trial," and, thus, she could not effectively assist him. On December 8, 2006, Mundon filed two additional motions for the written transcripts (an amended motion and a second motion).

Immediately prior to the commencement of trial on December 11, 2006, the trial court addressed Dennemeyer's December 4, 2006 motion to withdraw as standby counsel. In support of her motion, Dennemeyer argued, *inter alia*, that

in his written motion, Mr. Mundon cited the court rule that provides the defendant gets written transcripts, written transcript, [g]rand [j]ury, preliminary hearing, that's what he cited. That's what he asked for. The motion was never granted or denied. It was just kind of put aside. But it's been a problem and I've been stating the problem from day one.

The trial court denied Dennemeyer's motion and noted for the record that Mundon had submitted a request for transcripts six weeks prior to trial and observed that the trial court "did, in response to the request by Mr. Mundon, make available the CD's ... [w]hich [are] made available to anyone else who requests and who pays the fee." Subsequent to the trial court's denial of her motion, Dennemeyer asked that Mundon be permitted to review the CDs of the transcripts at least once prior to trial. The trial court indicated that it would not further delay the trial and that Mundon and Dennemeyer would have the opportunity to review the transcripts during the breaks.

On direct appeal, the ICA concluded that "Mundon should have been provided the written transcripts that he requested," SDO at 3 (citing, *inter alia, Britt v. North Carolina,* 404 U.S. 226, 228, 92 S.Ct. 431, 30

L.Ed.2d 400 (1971) and *Roberts v. LaVallee*, 389 U.S. 40, 41–42, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967)). However, the ICA also concluded that the trial court's failure to provide Mundon with the written transcripts was harmless inasmuch as Mundon failed to show that he was prejudiced by proceeding at trial without written transcripts. SDO at 3. Specifically, the ICA stated that:

> Mundon claims that he was entitled to a transcript of the preliminary hearing so he could cross-examine the complaining witness, who allegedly was unable to identify him at the preliminary hearing. However, Mundon has not substantiated this claim by including the transcript of the preliminary hearing in the record on appeal. *See State v. Hoang*, 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000) (holding that error will not be presumed "from a silent record" and that "without the relevant transcript, there is insufficient evidence to review the alleged error, and the appellant carries the burden of demonstrating the alleged error in the record"). Regarding Mundon's request for a transcript of the grand-jury proceeding, the record indicates that all that transpired before the grand jury was the playing of the tape recording of the complaining witness's interview with a police officer, which recording had previously been provided to Mundon.

*Id.* at 3–4 (internal brackets omitted). On application, Mundon argues that the ICA erred in concluding that Mundon did not show that he was prejudiced by proceeding to trial without written transcripts because he alleged on direct appeal that (1) the complainant could not identify him at the February 2004 preliminary hearing and (2) he was otherwise deprived of his due process rights when the trial court provided him access only to "useless compact disks."

As indicated by the ICA, it is well-settled that a criminal defendant has a right to transcripts of prior proceedings. SDO at 3; *see Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971) (As a matter of equal protection, "there can be no doubt that the [trial court] must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed

for an effective defense or appeal."). As such, we examine whether Mundon was required to show that he was prejudiced by proceeding to trial without the written transcripts. In that regard, *Britt* is instructive.

In *Britt*, the Supreme Court was faced with the issue whether an indigent defendant was entitled to written transcripts of prior proceedings despite not having shown a specific need for the transcript "for an effective defense." 404 U.S. at 227, 92 S.Ct. 431. In addressing the issue, the Court set forth the following two factors: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought[;] and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *Id.* Expounding on the value of transcripts to the defendant, the *Britt* Court concluded that:

> Our cases have consistently recognized the value to a defendant of a transcript of prior proceedings, *without requiring a showing of need tailored to the facts of a particular case* ... [and], even in the absence of specific allegations[,] it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses.

*Id.* at 228, 92 S.Ct. 431.

Inasmuch as the Supreme Court has previously recognized the innate value of transcripts for trial preparation and impeachment purposes and that a defendant need not show a need for the transcripts "tailored to the facts of a particular case," we conclude that the written transcripts here had significant value to Mundon in preparing for trial, and his claim that he was prejudiced by proceeding without such transcripts was not "unsubstantiated" merely because he did not request that the transcripts of prior proceedings be included in the record on appeal or otherwise identify specific examples of prejudice. Next, we examine the second factor, *i.e.*, whether there was an adequate alternative to the written transcripts available to Mundon, such as the electronic copies of the transcripts provided to him.

In *Gonzales v. District Court In and For Weld County,* 198 Colo. 505, 602 P.2d 857 (1979), the Supreme Court of Colorado held that, because a preliminary hearing transcript "is a vital impeachment tool for use in cross-examination of the [prosecution's] witnesses and for trial preparation in general," "the transcript must be available to defense counsel prior to the trial if it is to be useful as an impeachment and trial preparation tool." *Id.* at 858 (citations and internal quotation marks omitted). The *Gonzales* court ultimately held that *"[p]roviding the preliminary hearing transcript for the first time at trial is . . . not an adequate alternative to providing the transcript before the trial."* *Id.* (citing *Britt,* 404 U.S. 226, 92 S.Ct. 431) (emphasis added) (other citation omitted).

██ In the instant case, Mundon was provided with CDs of the relevant transcripts as an alternative to written transcripts because written transcripts were never provided "in the ordinary course." However, *Mundon was unable to review the electronic transcripts until the first day of trial* because he did not have the requisite equipment available to him and neither did his standby counsel. Further, the trial court permitted Mundon to review the transcripts only during the breaks in trial. Because Mundon was essentially "provided the transcript for the first time at trial," the electronic transcripts were not an adequate alternative to the written transcripts, and the record does not reveal any other available alternative.

Based on the foregoing, we conclude that Mundon was not required to show that he was prejudiced by proceeding to trial without the written transcripts because (1) there is innate value to a criminal defendant in being able to review transcripts for trial preparation and impeachment purposes such that a defendant need not show a particularized need for such transcripts and, (2) under the circumstances, no adequate alternative to the written transcripts existed. Thus, we hold

that the ICA erred in concluding that the trial court's failure to provide Mundon with written transcripts was harmless error.

## C. Lack of Access to Trial Preparation Materials

██ Immediately prior to the commencement of trial on December 11, 2006, the trial court addressed several pre-trial issues, including motions from the prosecution. Mundon informed the court that he did not have his trial preparation materials because he was transported from Halawa Correctional Facility on the island of O'ahu to Kaua'i Community Correctional Center (KCCC) four days prior to trial without any trial materials. Mundon indicated that, without his materials, he was unable to properly respond to the prosecution's motions *in limine,* stating:

> That's the only situation that I'm bringing on the record to the [trial c]ourt. That surprising my flight here [sic] . . . not letting me bring my paperwork here. I don't have the motions that [the] . . . [prosecution] has. I had them all with me. I had all my motions and objections prepared; but, surprisingly, I was—I mean it's not the hardship of not being an attorney. It's the hardship of being put in a situation where I couldn't bring my stuff with me.

The trial court indicated that, although Mundon did not have his trial materials, it would not further delay the trial inasmuch as the first day of trial would primarily be spent on jury selection and Mundon's materials were scheduled to arrive on the second day of trial. Additionally, the trial court stated that it had "repeatedly cautioned [Mundon] that one of the problems of representing yourself when you're incarcerated is that there may be issues that you may be facing that are beyond the scope of this [trial c]ourt." The trial court then moved forward and heard arguments on the prosecution's motions *in limine.*[17]

17. We note that, in addressing Mundon's argument that the trial court improperly refused to continue the trial based on Mundon's lack of access to his trial materials, the ICA applied an abuse of discretion standard of review, stating "we cannot conclude that the [trial] court *abused*

*its discretion* in refusing to continue the commencement of trial." SDO at 4 (emphasis added). However, Mundon contended before the ICA—and on application—that the trial court denied him his *constitutional right to due process* when it forced him to begin trial after four days

■ As previously stated, Mundon contends that he was denied his constitutional right to due process when the trial court forced him to proceed to trial without his trial materials. Regarding procedural due process, we have stated that:

> Due process is not a fixed concept requiring a specific procedural course in every situation. Rather, due process is flexible and calls for such procedural protections as the particular situation demands. The basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

*State v. Adam*, 97 Hawai'i 475, 482, 40 P.3d 877, 884 (2002). The issue presented in the instant case—whether due process requires that a *pro se* criminal defendant be permitted to have access to his materials at the start of his trial—is an issue of first impression in this jurisdiction and, thus, we turn to cases outside of this jurisdiction for guidance.

The Supreme Court of California has previously held that a self-represented defendant has a "general constitutional right to adequate time for the preparation of his defense." *People v. Maddox*, 67 Cal.2d 647, 63 Cal.Rptr. 371, 433 P.2d 163, 168 (1967). Specifically, "[t]he denial of a proper request for a continuance to prepare a defense constitutes ... a denial of due process." *People v. Cruz*, 83 Cal.App.3d 308, 325, 147 Cal.Rptr. 740 (1978). Further, a *pro se* defendant "is not entitled to any greater privileges or time than what is accorded attorneys; but neither is he entitled to any *less.*" *People v. Sherrod*, 59 Cal.App.4th 1168, 1175, 69 Cal.Rptr.2d 361 (1997) (citing *Maddox*, 63 Cal.Rptr. 371, 433 P.2d at 167) (emphasis in original). Additionally, "[w]hile it is true that a defendant[ ] who chooses to conduct his defense [*pro se* ] does so subject to the disabilities normally attendant upon [his] status as a prisoner, a *pro se* defendant *must be given a reasonable opportunity to prepare a defense.*" *Cruz*, 83

Cal.App.3d at 324, 147 Cal.Rptr. 740 (emphases added).

Here, Mundon was unexpectedly transported from Halawa to KCCC four days prior to trial without being permitted to bring his materials. As a result, Mundon was deprived of critical preparation time *immediately preceding trial*—a time arguably most crucial to trial preparation. Moreover, Mundon was further disadvantaged by the lack of access to his trial materials *during the trial court's consideration of the prosecution's motions in limine* because he was denied the "privilege" of consulting his trial materials to respond to the motions and was forced to orally respond, relying on only his memory of the case. Nevertheless, the trial court refused to delay the trial, stating that it had "repeatedly cautioned [Mundon] that one of the problems of representing yourself when you're incarcerated is that there may be issues that you may be facing that are beyond the scope of this [trial c]ourt." However, because Mundon's unexpected transfer to KCCC was completely out of his control, his situation cannot be said to be a "disabilit[y] normally attendant upon [his] status as a prisoner," *Cruz*, 83 Cal.App.3d at 324, 147 Cal.Rptr. 740, nor one "beyond the scope" of the trial court. Thus, in order to protect Mundon's constitutional rights, the trial court could have continued the trial, conditioned upon Mundon's agreement to waive his right to a speedy trial, especially given the fact that Mundon's materials were scheduled to arrive the next day. Having failed to provide Mundon with such option and compelling him to proceed without his materials, we conclude that the trial court denied Mundon his constitutional due process right to adequately prepare his defense.

### D. *Remaining Contentions*

#### 1. **Right to a Speedy Trial**

On direct appeal, the ICA held that Mundon's right to a speedy trial was not violated

---

in custody without access to his trial materials, thereby giving the prosecution an unfair advantage. As previously indicated, constitutional questions of law are reviewed *de novo*, under the right/wrong standard. *See Jenkins*, 93 Hawai'i at 100, 997 P.2d at 26.

We recognize that Mundon does not contend that the ICA erred in applying the abuse of

discretion standard of review; however, it was plain error for the ICA to apply such standard inasmuch as Mundon's argument clearly raises a constitutional question of law that requires *de novo* review. We, therefore, address Mundon's argument pursuant to the *de novo* standard of review.

because the record established that Mundon requested or agreed to three continuances of trial and such periods of continuance were properly excluded in calculating whether six months had elapsed pursuant to HRPP Rule 48. SDO at 3 (citing HRPP Rule 48(c) (describing excluded periods)). In essence, the ICA concluded that, because a total of six months had not yet elapsed pursuant to HRPP Rule 48 (based on Mundon's own requests for continuances), Mundon's right to a speedy trial was not violated.

On application, Mundon contends that the ICA gravely erred in concluding that his constitutional right to a speedy trial was not violated because the trial court unreasonably rejected motions he attempted to file in July 2006, which ultimately caused the trial date to be continued until December 2006—a "delay [that] should not be charged to [Mundon]." More specifically, Mundon argues that the trial court's

> [i]nsistence upon a level of perfection in excess of court rules led to[,] at very least, the delay in trial from 7/31/06 to 12/11/06. This, along with the 150 [day] delay [after the indictment], far surpasses the 180 days within which trial needed to commence and this matter should have been dismissed.

Article I, section 14 of the Hawai'i Constitution provides in pertinent part that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" *See also* U.S. Const. amend. VI. Such constitutional right to a speedy trial is "the substantive right that HRPP Rule 48, through a procedural mechanism that is 'separate and distinct' therefrom, seeks to protect." *State v. Jackson*, 81 Hawai'i 39, 54, 912 P.2d 71, 86 (1996) (citing *State v. Lau*, 78 Hawai'i 54, 60, 890 P.2d 291, 297 ("Notwithstanding the fact that HRPP Rule 48 is 'separate and distinct' from its constitutional counterparts, both provisions seek to ensure the speedy resolution of criminal prosecutions, particularly where a person may suffer a restraint on his or her liberty.")) (other citation omitted).

As previously noted, HRPP Rule 48(b) provides in relevant part that

> the trial court shall, on motion of the defendant, dismiss the charge[s against him], with or without prejudice in its discretion, if trial is not commenced *within six months* ... from the date of re-arrest or re-filing of the charge[s], in cases where an initial charge was dismissed upon motion of the defendant.

(Emphasis added.) HRPP Rule 48(c) provides in relevant part that "the following periods shall be excluded in computing the time for trial commencement: ... periods that delay the commencement of trial and are caused by a continuance *granted at the request or with the consent of the defendant or defendant's counsel*." (Emphasis added.)

The record reflects that trial was originally set for February 6, 2006. On February 3, 2006, Mundon made an oral motion to continue the trial. At that time, the following exchange between Mundon and the trial court occurred:

> THE COURT: So, Mr. Mundon, for the record, you are, at this time, waiving your [HRPP] Rule 48 [quoted *supra* note 16] [right]?

> [Mundon]: Yes. Yes, I have to because, like I said, the time is too short and we wasted enough time earlier already[.]

> THE COURT: And this additional time is needed by you to help prepare for the trial?

> [Mundon]: Yes.

The trial court granted Mundon's motion to continue over the objection of the prosecution and set a new trial date for June 5, 2006.

On March 17, 2006, the prosecution filed a motion to either continue or advance the trial date. Mundon agreed to advance the trial date, which the trial court subsequently reset for May 15, 2006. On May 15, 2006, Mundon agreed to continue the trial to July 31, 2006.[18]

At the time it granted standby counsel Castillo's motion to withdraw on July 6, 2006, the trial court encouraged Mundon to contin-

---

18. The record does not indicate whether the continuance was based on a request by the prosecu-

tion or Mundon, or a necessity of the trial court.

ue the trial; however, Mundon repeatedly indicated that he would be prepared to go forward with trial on July 31, 2006. However, at a pre-trial conference on July 24, 2006, Mundon claimed that, because Castillo—during his previous representation of Mundon—had failed to properly re-file his motions (referring to those that had been rejected by the court due to non-compliance with court rules) as he had promised and had otherwise "done nothing for him for five months," he was not prepared to proceed to trial on July 31, 2006. He, therefore, orally moved to continue the trial, which the trial court granted, and a firm trial date was set for December 11, 2006.

On September 6, 2006, Mundon filed a motion to dismiss based on HRPP Rule 48, alleging, *inter alia*, that more than 180 days (six months) had passed since his August 15, 2005 indictment, and, thus, his case should be dismissed. At a hearing on September 28, 2006, the trial court orally denied Mundon's motion.[19] On October 13, 2006, the trial court issued the following findings of fact (FOFs) and conclusions of law (COLs), as well as a written order denying Mundon's motion to dismiss:

### [FOFs]

1. On August 15, 2005, [Mundon] was indicted in Cr. No. 05-1-0206.

2. [Mundon] was arraigned on January 12, 2006 and given a trial date of February 2, 2006.

3. On February 3, 2006, [Mundon] requested a continuance and the [trial c]ourt granted the continuance to June 5, 2006.

4. On April 3, 2006, the [prosecution] moved to continue or advance trial. The [trial c]ourt advanced the trial to May 15, 2006.

5. On May 15, 2006, [d]efense [c]ounsel indicated that he and [Mundon] agreed to continue the case, and the trial was set for July 31, 2006.

6. On July 24, 2006, [Mundon] stated that he was not prepared for trial on July 31, 2006 and requested additional time. The [trial c]ourt granted a continuance to December 11, 2006 with [Mundon]'s express approval.

7. [Mundon] filed his [m]otion to [d]ismiss on September 6, 2006.

8. Therefore, a total of 384 days have passed since the [g]rand [j]ury returned an indictment and the filing of [Mundon]'s [m]otion to [d]ismiss. However, 215 days are excludable under [HRPP] Rule 48(c). Therefore, *there are [eleven] days left after the current trial date of December 11, 2006 for the [prosecution] to commence trial in this case.*

### [COLs]

1. [HRPP] Rule 48 provides, *inter alia,* that a defendant is to have his trial commenced within six months of the date of arrest, if bail is set, or from the filing of the charge, whichever is sooner.

2. However, HRPP Rule 48(c)[ (3) ] provides for excludable time periods, including:

> (3) *periods that delay the commencement of trial and are caused by a continuance granted at the request of or with the consent of the defendant or defendant's counsel[.]*

(Emphases added.)

The trial court determined—and Mundon does not dispute—that the delays from February 6, 2006 to June 5, 2006 and May 15, 2006 to July 31, 2006 were based on either a request or agreement to continue the trial by Mundon. Thus, the sole issue here is whether Mundon's request for continuance from July 31, 2006 to December 11, 2006 was caused by the trial court's rejection of Mundon's motions and, thus, should not be attributed to Mundon.

During the July 24, 2006 hearing, the trial court acknowledged its rejection of the five motions that Mundon attempted to file, but Mundon *did not allege or argue at that time*

---

19. During the hearing, Mundon again waived his right to counsel and expressed his intent to represent himself, but also requested the appointment of standby counsel. As previously indicated, the trial court granted Mundon's request and subsequently issued an order appointing Dennemeyer to act as Mundon's standby counsel.

*that the trial court's rejection of his motions caused his need for a continuance.* To the contrary, Mundon indicated that his request for a continuance was based on his former counsel's failure to do anything with his case for five months (including re-filing his non-conforming motions). Moreover, Mundon did not, in his September 6, 2006 motion to dismiss, allege that the trial court's rejection of his non-conforming motions "led to the delay in trial from 7/31/06 to 12/11/06" and "should not be charged to him."

 It has been recognized that *pro se* litigants are allowed more latitude than litigants represented by counsel to correct defects in service of process and pleadings. *See, e.g., Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). However, it is axiomatic that the parties bear the ultimate burden to comply with the rules of court when filing moving papers and, in any event, the trial court rejected Mundon's motions without prejudice, giving Mundon the opportunity to re-file and "correct defects." Thus, even if the trial court's rejection of Mundon's non-conforming motions impaired his ability to proceed to trial on July 31, 2006, any resulting delay or request for continuance should be attributed to Mundon based upon his failure to comply with the rules of court. As such, the trial court properly excluded the time period between July 31, 2006 to December 11, 2006 from the six-month calculation set forth in HRPP Rule 48(b) and (c) and correctly found that, based on Mundon's consent to or request for three continuances, "there [were eleven] days left after . . . December 11, 2006 for the [prosecution] to commence trial[.]" Inasmuch as trial commenced on December 11, 2006—within the six month time period as defined in HRPP Rule 48(b),—we hold that Mundon was not deprived of his constitutional rights to due process or a speedy trial and, accordingly, the ICA did not err in making the same determination.

## 2. Right to Assistance of Counsel

During the prosecution's cross-examination of Mundon, Dennemeyer requested that she be permitted to approach Mundon and speak with him in order to clarify a "confusing" line of questioning. The trial court denied Dennemeyer's request until the next break in trial. When the trial court took a 15-minute recess, the prosecution requested that Dennemeyer be prohibited from communicating with Mundon at any point during his cross-examination, including during any recesses that may be taken. The trial court granted the prosecution's request, stating:

> Ms. Dennemeyer, as you well know, it is not proper for attorneys to be coaching witnesses in the middle of their testimony.
>
> By the same manner, Mr. Mundon has made the decision to take the witness stand, and the prosecutor is correct. It would be improper for you to approach him or to speak with him in the middle of his testimony.
>
> By the same token, Mr. Mundon, as I said, if you don't understand the question, then say so.

In response, Dennemeyer indicated to the trial court that "[t]hat was all I wanted to tell [Mundon]. Thank you."

On appeal, the ICA held that "Mundon is judicially estopped from raising th[e] argument [that he was deprived of his constitutional right to counsel] since he clearly invoked his right to self-representation and received a discretionary appointment of standby counsel." SDO at 5. Further, the ICA essentially held that the trial court's action in precluding Mundon from consulting his standby counsel was harmless inasmuch as "the record establishes that the [trial] court effectively communicated the advice that standby counsel desired to impart to Mundon—that [he] should ask for clarification if he did not understand a question posed to him[.]" *Id.*

On application, Mundon contends that the ICA erred in determining that he was not denied his constitutional right to counsel because "[c]urtailment of attorney-client consultation violates rights [to counsel] conferred" under both the state and federal constitutions and "[t]he standby role of Mundon's counsel does not call for a different result." Mundon further argues that, "[a]lthough the [trial] court communicated the warning counsel was planning to deliver, the

admonition did not address any matter or concern which [Mundon] may have wished to raise with his court-appointed counsel." Inasmuch as Mundon claims he was denied his state and federal constitutional right to assistance of counsel, we first address whether a criminal defendant has a federal constitutional right to confer with counsel during breaks in his testimony at trial.

### a. right to confer with counsel under the federal constitution

The United States Supreme Court has twice considered the issue whether the Sixth Amendment's right to counsel requires that a criminal defendant be permitted to confer with counsel during breaks in trial when he is testifying. First, in *Geders v. U.S.*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), the trial court ordered the defendant not to consult with his counsel during an overnight recess taken while the defendant was testifying. *Id.* at 82–83, 96 S.Ct. 1330. Following his conviction, the defendant appealed, arguing that he had a right, under the Sixth Amendment, to confer with his counsel during an overnight recess. *Id.* at 86, 96 S.Ct. 1330. The United States Court of Appeals for the Fifth Circuit affirmed the defendant's conviction, concluding that the defendant failed to show that he was prejudiced by his inability to consult with his attorney during the overnight recess. *Id.* The Supreme Court granted certiorari and concluded that "[o]ur cases recognize that the role of counsel is important precisely because[,] ordinarily[,] a defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance," *id.* at 88, 96 S.Ct. 1330, and "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Id.* at 88–89, 96 S.Ct. 1330. Although the Court recognized the importance of ensuring the consistency of witnesses' testimonies by preventing them from discussing such testimony, the Court distinguished a witness from a criminal de-

fendant who testifies on his own behalf, stating that a defendant "lacks both the skill and knowledge adequately to prepare his defense, even though he (may) have a perfect one. He requires the guiding hand of counsel at *every step in the proceedings against him.*" *Id.* at 89, 96 S.Ct. 1330 (quoting *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932)) (emphasis added). Consequently, the Court held that "an order preventing [the defendant] from consulting his counsel 'about anything' during a [seventeen]-hour overnight recess between his direct- and cross-examination impinged upon his right to assistance of counsel guaranteed by the Sixth Amendment." *Geders*, 425 U.S. at 91, 96 S.Ct. 1330. Thus, the Supreme Court reversed the defendant's conviction. *Id.* However, the Court limited the scope of its holding, stating that "[w]e need not reach, and we do not deal with limitations [on conferences with counsel] imposed in other circumstances." *Id.*

Thereafter, in *Perry v. Leeke*, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), the Supreme Court considered the very issue it reserved in *Geders*, that is, whether a criminal defendant has a constitutional right to confer with his counsel in "other circumstances"—specifically, during a 15–minute recess taken during the defendant's testimony. *Id.* at 274, 109 S.Ct. 594. A majority of the Court distinguished the long overnight break in *Geders* from the 15–minute recess in *Perry*, stating that:

> Admittedly, the line between the facts of *Geders* and the facts of this case is a thin one. It is, however, a line of constitutional dimension.... The distinction rests ... on the fact that[,] when a defendant becomes a witness, he has no constitutional right to consult with his lawyer while he is testifying. He has an absolute right to such consultation before he begins to testify, but neither he nor his lawyer has a right to have testimony interrupted in order to give him the benefit of counsel's advice." [20]

20. More specifically, the Court stated that:
The interruption in *Geders* was of a different character because the normal consultation between attorney and client that occurs during an overnight recess would encompass matters that go beyond the content of the defendant's

own testimony—matters that the defendant does have a constitutional right to discuss with his lawyers, such as the availability of other witnesses, trial tactics, or even the possibility of negotiating a plea bargain. It is the defendant's right to unrestricted access to his lawyer

*Id.* at 280–81, 109 S.Ct. 594. Emphasizing the importance of preserving the integrity of the "truth-seeking function" at trial, the majority stated:

Permitting a witness, including a criminal defendant, to consult with counsel after direct examination but before cross-examination grants the witness an opportunity to *regroup and regain a poise and sense of strategy* that the unaided witness would not possess. This is true even if we assume no deceit on the part of the witness; it is simply an empirical predicate of our system of adversary rather than inquisitorial justice that cross-examination of a witness who is uncounseled between direct examination and cross-examination is *more likely to lead to the discovery of truth than is cross-examination of a witness who is given time to pause and consult with his attorney.* "Once the defendant places himself at the very heart of the trial process, *it only comports with basic fairness that the story presented on direct is measured for its accuracy and completeness by uninfluenced testimony on cross-examination.*"

*Id.* at 282–83, 109 S.Ct. 594 (citing *United States v. DiLapi,* 651 F.2d 140, 151 (2d. Cir.1981)) (Mishler, J., concurring), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1428, 71 L.Ed.2d 648 (1982) (emphases added). The majority, quoting *DiLapi,* then explained the "vital role" of uninfluenced cross-examination, stating that:

The importance of cross-examination to the English judicial system, and its continuing importance since the inception of our judicial system in testing the facts offered by the defendant on direct, ... *suggests that the right to assistance of counsel did not include the right to have counsel's advice on cross-examination.* The [c]ourt has consistently acknowledged the vital role of cross-examination in the search for truth. It has recognized that the defendant's decision to take the stand, and to testify on his own behalf, places into

question his credibility as a witness and that the prosecution has the **right** to test his credibility on cross-examination.

*Id.* at 283 n. 7, 109 S.Ct. 594 (citing *DiLapi,* 651 F.2d at 149–51) (emphasis in original). Thus, the majority concluded that,

just as a trial judge has the unquestioned power to refuse to declare a recess at the close of direct testimony—or at any other point in the examination of a witness—we think the judge must also have the power to maintain the status quo during a brief recess in which there is a virtual certainty that any conversation between the witness and the lawyer would relate to the ongoing testimony. As we have said, we do not believe the defendant has a constitutional right to discuss that testimony while it is in process.

*Perry,* 488 U.S. at 283–84, 109 S.Ct. 594. Ultimately, the majority held that "the [f]ederal [c]onstitution does not compel every trial judge to allow the defendant to consult with his lawyer while his testimony is in progress" merely because the judge decides to call a recess during the trial for a few minutes. *Perry,* 488 U.S. at 284–85, 109 S.Ct. 594.

However, the dissent in *Perry* disagreed with the majority's distinction between a long overnight break in trial proceedings (as in *Geders* ) and the 15–minute recess taken during a defendant's testimony, opining that such distinction "has no constitutional or logical grounding, and rests on a recondite understanding of the role of counsel in our adversary system." *Perry,* 488 U.S. at 285, 109 S.Ct. 594 (Marshall, J., dissenting, joined by Brennan, J., and Blackmun, J.). The dissent asserts that "[c]entral to our Sixth Amendment doctrine is the understanding that legal representation for the defendant at every critical stage of the adversary process *enhances* the discovery of truth because it better enables the defendant to put the [prosecution] to its proof." *Id.* at 291, 109 S.Ct. 594 (Marshall, J., dissenting, joined by

for advice on a variety of trial-related matters that is controlling in the context of a long recess. The fact that such discussion will inevitably include some consideration of the defendant's ongoing testimony does not compromise that basic right. But in a short recess in which

it is appropriate to presume that nothing but the testimony will be discussed, the testifying defendant does not have a constitutional right to advice.

*Id.* at 284, 109 S.Ct. 594 (citation omitted).

Brennan, J., and Blackmun, J.) (emphasis in original). "Absent [such] representation, it is unlikely that a criminal defendant will be able adequately to test the government's case[.]" *Id.* (citing *Penson v. Ohio,* 488 U.S. 75, 84, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988)).

In the dissent's view, "[t]he majority's fears about the deleterious effects of attorney-defendant contact during trial recesses are vastly overstated." *Id.* at 292, 109 S.Ct. 594. Specifically, the dissent points out that "a few soothing words from counsel to the agitated or nervous defendant facing the awesome power of the [prosecution] might *increase* the likelihood that the defendant will state the truth on cross-examination" and that "to remind a defendant that certain cross-examination questions might implicate his right against self-incrimination or relate to previously excluded evidence, or to caution a defendant to mind his demeanor at all times, is merely to brace the defendant for the 'legal engine' steaming his way." *Id.* at 292–93, 109 S.Ct. 594 (emphasis in original) (citation omitted). In rebuttal to the majority's position that the accurate, complete, and uninfluenced testimony of the defendant would be impeded by allowing counsel and defendant to confer during a 15–minute recess, the dissent asserts that "[n]owhere have we suggested that the Sixth Amendment right to counsel turns on *what the defendant and his attorney discuss or at what point during a trial their discussion takes place.*" *Id.* at 291, 109 S.Ct. 594 (emphasis added). Thus, contrary to the majority's holding, the dissent concluded that

> the Sixth Amendment forbids "*any* order barring communication between a defendant and his attorney, at least where that communication would not interfere with the orderly and expeditious progress of the trial." This view is hardly novel; on the contrary, *every* Court of Appeals to consider this issue since *Geders* ... has concluded that a bar on attorney-defendant contact, even during a brief recess, is impermissible if objected to by counsel. With very few exceptions, the state appellate courts that have addressed this issue have agreed.

*Id.* at 285–86, 109 S.Ct. 594 (bold emphasis added) (italicized emphases in original) (citations omitted). Further, the dissent disapproved of the majority's view that defendants should be afforded the same treatment as witnesses, stating that "the Sixth Amendment accords defendants constitutional rights above and beyond those accorded witnesses generally." *Id.* at 289, 109 S.Ct. 594. Ultimately, the dissent concluded that the majority's holding "isolat[ed] the defendant at a time when counsel's assistance is perhaps most needed.... The Constitution does not permit this new restriction on the Sixth Amendment right to counsel." *Id.* at 298, 109 S.Ct. 594.

Here, Mundon—like the defendant in *Perry*—argues that he had the right to confer with his counsel during the routine break taken during his testimony. Inasmuch as the facts of the instant case are identical to those in *Perry* and distinguishable from *Geders,* it is clear that—under the reasoning of the *Perry* majority—Mundon did not have a Sixth Amendment right to consult with his counsel during the 15–minute recess taken during his cross-examination. However, article I, section 14 of the Hawai'i Constitution also gives a criminal defendant the right to the assistance of counsel, but the issue whether a criminal defendant has a state constitutional right to speak with counsel during a break in his testimony is an issue of first impression in this jurisdiction, which we now examine.

b. *right to confer with counsel under Hawaii's Constitution*

This court has long recognized that, "as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution, we are free to give broader protection under the Hawai'i Constitution than that given by the federal [C]onstitution." *Arceo,* 84 Hawai'i at 28, 928 P.2d at 870 (quoting *State v. Wallace,* 80 Hawai'i 382, 397 n. 14, 910 P.2d 695, 710 n. 14 (1996)) (other citation omitted). Further, this court has previously concluded that, "when the United States Supreme Court's interpretation of a provision present in both the United States and Hawai'i Constitutions

does not adequately preserve the rights and interests sought to be protected, we will not hesitate to recognize the appropriate protections as a matter of state constitutional law." *State v. Bowe*, 77 Hawai'i 51, 57, 881 P.2d 538, 544 (1994). Indeed, this court has frequently provided "greater protection" under the Hawai'i constitution than that provided by the federal Constitution.[21] *See, e.g., Arceo*, 84 Hawai'i at 28, 928 P.2d at 870 (concluding that, although the Supreme Court has held that the federal Constitution did not "mandate unanimous verdicts for criminal prosecutions in state courts," the state constitution, nevertheless, required a unanimous verdict for convictions in criminal prosecutions); *Bowe*, 77 Hawai'i at 57, 881 P.2d at 544 (rejecting the federal approach because the Supreme Court's jurisprudence "limit[ed] the interests protected by federal constitutional confession law," and concluding that "independent constitutional considerations arising under article I, sections 5 and 10 of the Hawai'i Constitution compel us to hold that the coercive conduct of a private person may be sufficient to render a [d]efendant's confession involuntary").

 In our view, the holding of the *Perry* majority does not adequately protect a defendant's right to counsel under article I, section 14 of the Hawai'i Constitution for the following reasons. First, it is well-settled that "[t]he right of one charged with [a] crime to counsel [is] . . . deemed fundamental and essential to [a] fair trial[.]" *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Second, "[a defendant] lacks both the skill and knowledge adequately to prepare his defense, even though he (may) have a perfect one. He requires the guiding hand of counsel *at every step in the proceedings against him*." *Geders*, 425 U.S. at 89, 96 S.Ct. 1330 (quoting *Powell*, 287 U.S. at 68–69, 53 S.Ct. 55) (emphasis added). Third, as aptly observed by the *Perry* dissent:

[W]hile a defendant is on the stand during direct examination, he may remember the name or address of a witness, or the location of physical evidence, which would be helpful to his defense. It would take mere seconds to convey this information to counsel. As a matter of sound trial strategy, defense counsel might believe that this witness or evidence would have the most impact if presented directly after the defendant concluded his testimony. But[,] under the majority's approach, defense counsel would not even learn about this witness or evidence until the defendant steps down from the stand. Alternatively, the defendant might be so discouraged by this testimony on direct examination as to conclude that he should attempt plea negotiations with the prosecution immediately, or accept an outstanding plea bargain offer. It need only take a second for him to convey this to his lawyer, particularly if they had previously discussed the advisability of pleading guilty. This opportunity might be forever lost, however, if a bar order issues and the prosecution conducts a successful cross-examination.

*Perry*, 488 U.S. at 294, 109 S.Ct. 594 (Marshall, J., dissenting, joined by Brennan, J., and Blackmun, J.). And—as in this case—defendant's counsel may wish to apprise the defendant of his right to ask the examining counsel or the trial court for clarification of a particular question or line of questioning. Finally, "legal representation for the defendant at every critical stage of the adversary process *enhances* the discovery of truth because it better enables the defendant to put the [prosecution] to its proof." *Perry*, 488 U.S. at 290, 109 S.Ct. 594 (Marshall, J., dissenting, joined by Brennan, J., and Blackmun, J.) (emphasis in original).

 We are persuaded by the reasoning of the *Perry* dissent. More specifically, we agree with the *Perry* dissent that the majority's "constitutional" distinction from *Geders* is untenable inasmuch as such distinction was

---

**21.** The *Perry* majority recognized the possibility that a defendant's rights may be expanded under other circumstances, stating that

[o]ur conclusion does not mean that trial judges must forbid consultation between a defendant and his counsel during such brief recesses. As a matter of discretion in individual cases, or of practice for individual trial judges, or indeed as a matter of law in some [s]tates, it may well be appropriate to permit such consultation.

*Id.* at 284, 109 S.Ct. 594 (footnote omitted).

unsupported by public policy, the past precedent of the Supreme Court, and the previous approaches taken by federal and state appellate courts. Indeed, the only justifications proffered by the *Perry* majority for distinguishing *Geders* were the difference in the length of the recesses taken by the trial court and the "virtual certainty" that the defendant would discuss his ongoing testimony with his counsel. We further agree that a criminal defendant's well-settled constitutional right to the assistance of counsel does not—and should not—turn on the length of time that a trial court chooses to recess or what the defendant and his attorney choose to discuss. To the contrary, a criminal defendant has a constitutional right to confer with counsel at *all stages of his case, including recesses taken during his testimony.* We emphasize, however, that such conclusion should not be construed as requiring the trial court to call a recess whenever a criminal defendant wishes to confer with counsel. Indeed, the trial court has the power to control the examination of witnesses and other court processes and, thus, retains the discretion to determine the timing and duration of recesses to be taken during the trial proceedings. *See, e.g., Romero v. Hariri,* 80 Hawai'i 450, 454, 911 P.2d 85, 89 (App.1996) ("It is well-established that the trial court 'has substantial discretion in exercising control over the interrogation of witnesses' under Hawai'i Rules of Evidence (HRE) Rule 611(a) [ (2008) ]."). Additionally, preventing a defendant from conferring with his counsel during a recess of any length would not only deny his right to assistance of counsel, but would also improperly restrict the defendant's opportunity to be heard inasmuch as "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel[.]" *Geders,* 425 U.S. at 88–89, 96 S.Ct. 1330 (quoting *Powell,* 287 U.S. at 68–69, 53 S.Ct. 55).[22]

Moreover, we have previously emphasized the significance of a criminal defendant's constitutional right to counsel, albeit in a different context. In *State v. Smith,* 68 Haw. 304, 712 P.2d 496 (1986), we re-affirmed the state constitutional standard for establishing ineffective assistance of trial counsel previously set forth in *State v. Antone,* 62 Haw. 346, 615 P.2d 101 (1980). *Smith,* 68 Haw. at 309, 712 P.2d at 500. Specifically, the *Smith* court confirmed that a defendant must demonstrate that there were "specific errors or omissions ... reflecting counsel's lack of skill, judgment[,] or diligence" and that "these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *Id.* The *Smith* court observed that the federal standard for proving ineffective assistance of counsel was "unduly difficult for a [criminal] defendant to meet" and declined to adopt such standard, holding instead that, "for purposes of judging claims of inadequate representation brought under article I, section 14 of the Hawai'i Constitution, we shall continue to apply the standard enunciated in [*Antone* ]." *Id.* at 310 n. 7, 712 P.2d at 500 n. 7. Thereafter, in *Briones v. State,* 74 Haw. 442, 848 P.2d 966 (1993), we extended the standard for ineffective assistance of trial counsel to appellate counsel. *Id.* at 460–62, 848 P.2d at 975–76. Specifically, the *Briones* court stated that:

> No Hawai'i Supreme Court case has defined the standard by which the effectiveness of appellate counsel is to be judged. Federal jurisdictions have applied the standards for evaluating trial counsel to

---

22. Similarly, the *Perry* dissent observed:

> The majority assumes that it is possible to distinguish discussions regarding trial strategy from discussions regarding testimony. I am not so sure. Assume, for example, that counsel's direct examination of the defendant inadvertently elicits damaging information that can be effectively neutralized on redirect only if the defendant has the opportunity to explain his direct testimony to counsel. If a recess were called, the ensuing attorney-defendant discussion would seem to be as much about trial strategy as about upcoming testimony. With- out a chance to speak with the defendant, counsel will be hampered in knowing whether redirect is even advisable. *The majority's failure to spell out the difference—if there is one— between testimonial and non[-]testimonial discussions may well have a chilling effect on cautious attorneys, who might avoid giving advice on non-testimonial matters for fear of violating a court order barring recess discussions of testimonial matters.*
>
> *Perry,* 488 U.S. at 295 n. 8, 109 S.Ct. 594 (emphasis added) (citation, internal quotation marks, and brackets omitted).

the actions of appellate counsel. We have declined, however, to adopt the federal standard for reviewing trial counsel's performance. [*Smith*, 68 Haw. at 310 n. 7, 712 P.2d at 500 n. 7].... [W]e believe it appropriate to extend our stricter review of counsel's performance to the appellate stage in order to more fully protect the defendants' rights[.]

*Id.* (footnote and some citations omitted).

 Based on the foregoing, it is clear that the rule espoused by the majority in *Perry* does not adequately protect a criminal defendant's right to assistance of counsel as guaranteed in our state constitution. Thus, we decline to follow the federal approach set forth by the *Perry* majority and, instead, adopt the dissent's proposition that "**any** order barring communication between a defendant and his attorney, at least where that communication would not interfere with the orderly and expeditious progress of the trial," violates a criminal defendant's state constitutional right to counsel. *Perry*, 488 U.S. at 285, 109 S.Ct. 594 (Marshall, J., dissenting, joined by Brennan, J., and Blackmun, J.) (emphasis in original). Accordingly, we hold that a criminal defendant has a constitutional right to confer with his or her counsel during a *routine* recess taken during trial proceedings, even when such recess is taken in the middle of the defendant's testimony, except when a request for a non-routine recess for the purposes of conferring with counsel would, in the discretion of the trial court, interfere with the orderly and expeditious progress of the trial.[23] In adopting this approach, we believe it is appropriate to presume that counsel will uphold and adhere to their legal and ethical obligations as officers of the court when conferring with their defendant-clients during trial. In this regard, we agree with the dissent in *Perry* that, "[i]f our adversary system is to function according to design," "we must assume that an attorney will observe his responsibilities to the legal system, as well as to his client." *Perry*, 488 U.S. at 292 n. 5, 109 S.Ct. 594 (citing *United*

*States v. Allen*, 542 F.2d 630, 633 (1976) ("All but very few lawyers take seriously their obligation as officers of the court and their proper role in the administration of justice. We think the probability of improper counsel, *i.e.*, to lie or evade or distort the truth, is negligible in most cases.") (other citation and internal quotation marks omitted)).

 Consequently, we hold that the trial court erred when it ordered Mundon not to speak with his standby counsel during the 15–minute recess taken during his cross-examination. We recognize, however, that a constitutional error may be held harmless if "the court ... [is] able to declare a belief that it was harmless beyond a reasonable doubt." *State v. Napeahi*, 57 Haw. 365, 373, 556 P.2d 569, 574 (1976) (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). "In applying the harmless beyond a reasonable doubt standard[,] the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *State v. Balisbisana*, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996) (quoting *State v. Holbron*, 80 Hawai'i 27, 32, 904 P.2d 912, 917 (1995)). Thus, if there was no reasonable possibility that the trial court's error contributed to his conviction, such error was harmless beyond a reasonable doubt.

As previously indicated, Dennemeyer—Mundon's standby counsel—requested that she be permitted to approach Mundon and speak with him to clarify a "confusing" line of questioning during his cross-examination, but the trial court stated that she had to wait until a break in the proceedings to speak with Mundon. Thereafter, the trial court granted the prosecution's request to prohibit Dennemeyer from speaking with Mundon during any break taken during his testimony and told Mundon: "if you don't understand the question, then say so." Immediately following the trial court's admonishment to Mundon, Dennemeyer specifically represent-

---

23. Indeed, we note that the trial court, as discussed *infra*, retains its discretion in determining whether to take **non-routine** recesses, *i.e.*, those requested by the parties and taken outside the normal course of the proceedings, and may deny a defendant's request for such a recess, even if specifically sought for the purpose of conferring with counsel, if the trial court determines that a non-routine recess would interfere with the orderly and expeditious progress of the trial.

ed to the trial court that "[t]hat was all I wanted to tell [Mundon]. Thank you."

■ Based on such evidence, we agree with the ICA that "the trial court effectively communicated the advice that Mundon's standby counsel wanted to impart to Mundon [during the 15–minute recess]—that he should seek clarification if he did not understand a question posed to him." SDO at 5. We acknowledge that Mundon argued on application and at oral argument that, "[a]lthough the [trial] court communicated the warning counsel was planning to deliver, the [trial court's] admonition did not address any matter or concern which [Mundon] may have wished to raise with his court-appointed counsel." However, there was no evidence in the record or identified during oral argument before this court that Mundon did, in fact, have a "matter or concern" that he wanted to raise with Dennemeyer.

A review of the transcripts in this case indicates that, in general, Mundon, acting *pro se*, did not hesitate to assert himself and vocalized his position both before and during trial. Indeed, the record indicates that he frequently asked questions, lodged objections, presented arguments, and raised issues on his own behalf. Moreover, there is no evidence in the record that Mundon, during his direct or cross-examination, asked to speak with Dennemeyer, requested a recess for such purpose, or otherwise expressed a need to confer with his standby counsel. In fact, when the trial court granted the prosecution's request that Dennemeyer be prohibited from communicating with Mundon during the routine 15–minute recess, Mundon did not object, voice any concerns, or in any way indicate that he had any "matter or concern" that he wished to raise with her. Had Mundon felt the need to confer with Dennemeyer at that time, he seemingly would have objected or otherwise protested given his candid nature and assertive conduct throughout the proceedings. Absent any evidence in the record to support Mundon's speculatory assertion that he "may have wished to discuss [an issue] with his court-appointed counsel" during the recess, such assertion is insufficient, in this case, to show

that the trial court's error contributed to Mundon's ultimate conviction.

Finally, it is important to keep in mind that, as previously indicated, Mundon chose to represent himself and acted *pro se* for the duration of his trial. In such situations, the United States Supreme Court has stated that:

> The right of self-representation is not a license to abuse the dignity of the courtroom. . . . Thus, whatever else may or may not be open to him on appeal, *a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of "effective assistance of counsel."*

*Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (emphasis added). Although a court may appoint standby counsel to assist a *pro se* defendant, such standby or advisory counsel "do[es] not actively participate in the trial, but act[s] in an advisory capacity." *State v. Hirano,* 8 Haw.App. 330, 333 n. 5, 802 P.2d 482, 484 n. 5 (1990) (citing *Faretta,* 422 U.S. 806, 95 S.Ct. 2525).

Here, the record indicates that Mundon repeatedly stated that he wished to represent himself and ultimately refused the appointment of full-time counsel, despite frequent urging from the trial court. Thus, Mundon independently prepared for trial, formed his own trial strategy, and presented his own defense. During trial, Mundon conducted opening statements, questioned witnesses, raised objections, testified on his own behalf (in narrative form), and submitted a closing argument—all with little assistance from Dennemeyer. Other than assisting Mundon with evidentiary objections and advocating for his right to have access to pre-trial transcripts and trial preparation materials, Dennemeyer did not represent Mundon in the manner of a full-time attorney but, instead, acted only in an "advisory capacity." *See Hirano,* 8 Haw.App. at 333 n. 5, 802 P.2d at 484 n. 5. Given Mundon's conscious election to proceed *pro se*, it cannot be said that a minimal 15–minute deprivation of Mundon's access to his standby counsel during a trial that spanned six days contributed to his ultimate conviction. Moreover, it would be ab-

surd to vacate Mundon's convictions based on a violation of Mundon's right to assistance of counsel, as the dissent implicitly suggests, *when Mundon did not choose to utilize such right, but instead chose to represent himself.*

In sum, the record indicates that: (1) the trial court communicated the advice that Mundon's standby counsel wanted to impart to Mundon during the 15–minute recess; (2) there is no evidence that Mundon wished to speak with his standby counsel or requested a recess for such purpose at any point during his testimony; (3) Mundon did *not* object to the trial court's order preventing him from conferring with his standby counsel; and (4) Mundon chose to represent himself and acted *pro se* both before and during trial. In light of such specific facts and circumstances, we conclude, contrary to the dissent, that there is no "reasonable possibility" that the trial court's constitutional error contributed to Mundon's conviction. Consequently, we hold that, although the trial court's order preventing Mundon from conferring with Dennemeyer was constitutional error, such error was harmless beyond a reasonable doubt.

The dissent disagrees that the trial court's error should be subject to the harmless beyond a reasonable doubt standard. Although not explicitly stated, the dissent seemingly takes the position that *any* violation of a defendant's right to confer with counsel is *per se* harmful because "[t]he constitutional right to counsel guarantees defendants an opportunity for dialogue, and nowhere is it required that defendants provide affirmative evidence of their desire to avail themselves of this right." Dissenting op. at 380–81, 219 P.3d at 1167–68. However, the dissent's "bright line" rule that *any* deprivation of a defendant's right to confer with counsel is harmful could create unreasonable and absurd results.

For example, in the instant case and as previously discussed, Dennemeyer requested that she be permitted to approach Mundon to clarify a confusing line of questions while he was testifying on cross-examination, which the trial court denied, indicating she should wait until the next routine break in trial. However, at the next routine recess, Dennemeyer's request to speak with Mundon was effectively mooted when the trial court advised Mundon, "if you don't understand the question, then say so[,]" which is the advice that Dennemeyer indicated she planned to impart. Had the trial court, at that point, inquired of Mundon whether *he* had any need to confer with Dennemeyer and Mundon had answered "no," the dissent's bright line approach would, nevertheless, render the trial court's bar of communication between Mundon and Dennemeyer during the 15–minute recess reversible error. To reverse a defendant's conviction based on a violation of his right to confer with counsel, even where the defendant expressly states there is no need for such communication, would be absurd. Moreover, equally absurd is reversing Mundon's conviction where he never asked to confer with Dennemeyer nor objected to or expressed any concerns regarding the court's admonition not to confer with counsel during the routine 15–minute recess.

Additionally, the dissent's bright line approach extinguishes the discretion afforded to the trial court as indicated by our holding today and as stated by Justice Marshall in the *Perry* dissent, which the dissent here cites with approval. *See* dissenting op. at 373–74, 219 P.3d at 1160–61 (stating, "as Justice Marshall wrote[,] ... 'the Sixth Amendment forbids any order barring communication between a defendant and his attorney, at least where that communication would not interfere with the orderly and expeditious progress of the trial'" (citing *Perry*, 488 U.S. at 285, 109 S.Ct. 594 (Marshall, J., dissenting) (emphasis in original omitted) (underscored emphasis added))). More specifically and as previously noted, we conclude today that, although a defendant has a constitutional right to confer with counsel during *routine* recesses, the trial court maintains its discretion in determining whether to permit *non-routine* recesses requested by the parties during the course of trial. However, under the dissent's approach, a defendant who repeatedly asks to confer with his counsel while testifying and whose requests are denied by the trial court because, in the trial court's assessment, such non-routine recesses would interfere with the orderly and expeditious progress of the trial

would be entitled to a *per se* reversal or vacation of his conviction, even if the trial court did not abuse its discretion in refusing to take a non-routine recess. Such a result—like the aforementioned examples—would be absurd.

Finally, the dissent contends that, in reaching our conclusion, we improperly "examin[e] the reasons for conferring with a client during a trial recess," and, in so doing, "direct" that "the nature of the information or communication ... must be disclosed in order to determine whether a trial court's decision to prohibit discussions between an attorney and the defendant was harmless or not." Dissenting op. at 379, 219 P.3d at 1166. More specifically, the dissent argues that

> the majority, by grounding its analysis in what [Mundon's] counsel apparently wanted to say to [Mundon], incorrectly implies that it is appropriate to delve into the reasons for communications between an attorney and his or her client in order to gauge whether barring such communication during an ordinary recess was "harmless." As explained above, this approach is in derogation of the right to counsel, the attorney-client privilege and the right against self-incrimination.

*Id.* at 381, 219 P.3d at 1168. Contrary to the dissent's contention, we do not "ground" our analysis in what Mundon's counsel apparently wanted to say to Mundon or otherwise speculate regarding the content or substance of *what* Mundon may have wanted to discuss with his standby counsel in reaching our ultimate conclusion that the trial court's error was harmless. To the contrary, we point to the facts that Mundon: (1) did not *express any need* to speak with Dennemeyer; (2) never requested a recess for the purpose of conferring with her; and (3) never objected to or expressed concerns when the trial court prohibited communication between himself and Dennemeyer during the 15–minute routine recess. Clearly, our conclusion is not based on what Dennemeyer apparently wanted to say to Mundon or even on *what* Mundon may have wished to discuss with her but, instead, is based on the fact that Mundon never expressed a need to speak with Dennemeyer at all. As a result, our holding does

not, as the dissent contends, "direct that the nature of the information must be disclosed" or "imply" that it is appropriate to delve into the reasons for communication between an attorney and his or her client in order to determine whether the trial court's error was harmless. Moreover, our conclusion that the trial court's error was harmless beyond a reasonable doubt was not based exclusively on the lack of evidence that Mundon needed to speak with his counsel, *i.e.,* the lack of a specific request or objection. Indeed, as previously discussed, our holding is based on the additional facts that: (1) the trial court communicated the advice that Mundon's standby counsel affirmatively indicated that she had intended to impart to Mundon during the 15–minute recess; and (2) Mundon chose to represent himself and acted *pro se* both before and during trial. Consequently, the dissent's argument lacks merit.

### 3. Sentencing

On direct appeal, the ICA held that, "[i]n light of [this court's] decision in *State v. Kahapea,* 111 Hawai'i 267, 141 P.3d 440 (2006), Mundon's claim that the circuit court's imposition of consecutive sentences violated his right to a jury trial is without merit." SDO at 7 (citing *Oregon v. Ice,* —— U.S. ——, 129 S.Ct. 711, 172 L.Ed.2d 517 (2009)). On application, Mundon contends that the ICA gravely erred in affirming the trial court's imposition of a consecutive term of imprisonment because such sentence exceeded the statutory maximum and, thus, required a finding by a jury that aggravating factors existed, pursuant to *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In his application, Mundon acknowledges that the Supreme Court's holding in *Ice* rejects his position that the imposition of a consecutive sentence that exceeds the statutory maximum requires findings of fact by a jury. Nevertheless, Mundon "maintains that his position is correct," and he "wishes to prserve [sic] the argument for further challenge."

In *Kahapea,* the defendant appealed his sentence of, *inter alia,* five consecutive ten-year terms of imprisonment based on his conviction for five counts of theft in the first degree. *Id.* at 269, 141 P.3d at 442. On

appeal, this court initially observed that "stacking [the defendant's] multiple sentences together ha[d] the effect of enhancing the length of his incarceration beyond ten years, the statutory maximum of one first-degree theft." *Id.* at 279, 141 P.3d at 452. "Nevertheless, none of [the defendant]'s five individual terms exceeded the statutory maximum." *Id.* Thus, the *Kahapea* court held that the defendant's "sentence did not deprive him of his right to a jury trial as interpreted by the United States Supreme Court in *Apprendi* [and its progeny]." *Id.* at 280, 141 P.3d at 453. As acknowledged by Mundon, the Court in *Ice* likewise held that the rule in *Apprendi* requiring specific findings of fact from the jury did not apply to decisions by the trial court to impose a consecutive sentence. *Ice,* — U.S. at ——, 129 S.Ct. at 717.

▮ As previously stated, the trial court sentenced Mundon to a term of imprisonment of twenty years on each of the kidnapping and attempted sex assault 1st offenses, five years on each of the TT1 and attempted assault 2d offenses, as well as a one year term of imprisonment for the assault 3d offense. The trial court ordered all terms to run concurrently with each other, except for the twenty-year sentence for attempted sex assault 1st, which the trial court ordered to run consecutively. As in *Kahapea*, none of Mundon's individual prison terms exceeded the statutory maximum for each applicable offense.[24] Accordingly, we hold that the ICA did not err in affirming the trial court's imposition of a consecutive term of imprisonment.

24. The statutory maximum for both kidnapping and attempted sex assault 1st, which are classified as class A felonies, is twenty years imprisonment. *See* HRS § 706–659 (1993). Further, the statutory maximum for TT1 and attempted assault second (both class C felonies) is five years and the statutory maximum for assault 3d (a misdemeanor) is one year. *See* HRS §§ 706–660 and 706–663 (1993).

25. We note that neither party challenged in their moving papers before this court or during oral argument the ICA's holding that Mundon's convictions for kidnapping, TT1, attempted assault 2d, and assault 3d may have been improperly based on the same conduct, thereby requiring a

## IV. CONCLUSION

Based on the foregoing, we reverse Mundon's conviction for TT1, vacate Mundon's remaining convictions, and remand the case for a new trial consistent with this opinion.[25]

Concurring and Dissenting Opinion by ACOBA, J., in which DUFFY, J., joins.

In my view a defendant is entitled to counsel at all critical stages of a criminal proceeding, a trial is such a critical stage, the right to counsel applies to routine recesses during a trial, and a trial or a reviewing court may not inquire into the "need" for attorney-client consultation during such a recess, or condition such consultation upon a prior "objection," "request," or "concern" raised by the defendant. The majority's position violates such precepts and therefore I respectfully dissent from its decision on this issue.[1]

### I.

In this case, during the cross-examination of Petitioner/Defendant–Appellant James Mundon (Petitioner), the circuit court of the fifth circuit (the court) called a 15–minute recess, and the jury was escorted out of the courtroom. At that time, the court, the Deputy Prosecuting Attorney (DPA) representing Respondent/Plaintiff-Appellee State of Hawai'i (Respondent), and Caren Dennemeyer (Ms. Dennemeyer), Petitioner's standby counsel, engaged in a discussion at the bench. The following colloquy ensued in which the court barred Petitioner's right to confer with Ms. Dennemeyer during the recess:

> [DPA]: *[W]e would request at this time that Ms. Dennemeyer not be permitted to*

merger instruction to the jury. SDO at 7. In light of our reversal of Mundon's TT1 conviction, the option proffered by the ICA to (1) either (a) dismiss the TT1 or the kidnapping offense, or (b) retry Mundon on both counts, with an appropriate merger instruction given to the jury is moot. With respect to the offenses of attempted assault 1st and assault 3d, we agree with the ICA that a merger instruction was warranted. Consequently, on remand, an appropriate merger instruction should be given.

1. I concur in the other parts of the majority opinion.

*speak with [Petitioner] as he is in the middle of his cross-examination.*

MS. DENNEMEYER: *At all? That's not during the break or at all?*

THE COURT: That's correct. [Petitioner] has made the decision to take the stand and to testify, and just as when you have—

MS. DENNEMEYER: I'm here—

THE COURT: Ms. Dennemeyer. Ms. Dennemeyer, as you well know, *it is not proper for attorneys to be coaching witnesses in the middle of their testimony.*

By the same manner, [Petitioner] has made the decision to take the witness stand, and the [DPA] is correct. *It would be improper for you to approach him or to speak with him in the middle of his testimony.*

By the same token, [Petitioner], as I said, if you don't understand the question, then say so.

MS. DENNEMEYER: Thank you, your Honor.

THE COURT: If your answer—if you're not in agreement with what's being asked, then say so. Okay.

MS. DENNEMEYER: *Thank you, your Honor. That was all I wanted to tell him.* Thank you.

THE COURT: Anything further? Okay. Then let's take a 15–minute recess.

(Emphases added.) The court's ban plainly violated Petitioner's right to counsel,[2] Petitioner's attorney client privilege, *see* Hawai'i Revised Statutes (HRS) § 626–1 (Supp.2006), Hawai'i Rules of Evidence (HRE) Rule 503,[3] and Petitioner's right against self-incrimination.[4]

## II.

### A.

A defendant is entitled to counsel at every critical stage of a judicial proceeding. *Roe v. Flores–Ortega,* 528 U.S. 470, 483, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) ("The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage[ ]" of a "judicial proceeding." (Quoting *United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).).) Obviously, the "trial itself" is one of the critical stages during which the accused is entitled to representation. *Argersinger v. Hamlin,* 407 U.S. 25, 37, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) (holding that, "absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at his trial"); *United States v. Wade,* 388 U.S. 218, 227, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (stating that "[t]he presence of counsel at such critical

2. Petitioner argues that the "[c]urtailment of attorney-client consultation violates rights conferred under Amendment VI to the U.S. Constitution and Art. I, Section 14 of the State Constitution." All "references to federal law" herein are "used only for the purpose of guidance, and d[o] not themselves compel the result" reached in this opinion. *Arizona v. Evans,* 514 U.S. 1, 9–10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (citing *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). I adopt the rationale herein under the independent provisions of the Hawai'i Constitution.

The right to counsel is protected under article I, section 14 of the Hawai'i Constitution. It states, "In criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for the accused's defense." Similarly, Amendment VI to the U.S. Constitution states, "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."

3. The confidentiality of the attorney-client privilege is protected under HRS § 626–1, which enacted the HRE. HRE Rule 503(b) states, in part:

General rule of privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the lawyer or the lawyer's representative[.]

4. The right against self-incrimination is protected under article I, section 10 of the Hawai'i Constitution. It states, in relevant part, "nor shall any person be compelled in any criminal case to a witness against oneself." Amendment V of the U.S. Constitution also guarantees a defendant the privilege against self-incrimination. Amendment V states, in part, "[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]"

confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution").

In this connection, "a defendant in a criminal case must often consult with his attorney during the trial." *Geders v. United States*, 425 U.S. 80, 88, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). Therefore, as Justice Marshall wrote in his dissent in *Perry v. Leeke*, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989) [hereinafter *Perry II*], affirming *Perry v. Leeke*, 832 F.2d 837 (1987) [hereinafter *Perry I*], "the Sixth Amendment forbids *any* order barring communication between a defendant and his attorney, at least where that communication would not interfere with the orderly and expeditious progress of the trial." *Id.* at 285, 109 S.Ct. 594 (Marshall, J., dissenting, joined by Brennen, J. and Blackmun, J.) (internal quotation marks and citation omitted) (emphasis added).

### B.

Second, HRE Rule 503(b) provides that "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client[.]" This court has stated that "[t]he underlying principle of this privilege is to 'encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice[.]' " *Save Sunset Beach Coalition v. City & County of Honolulu*, 102 Hawai'i 465, 484, 78 P.3d 1, 20 (2003) (quoting *State v. Wong*, 97 Hawai'i 512, 518, 40 P.3d 914, 920 (2002)). The attorney-client privilege addresses "the need for the defendant to have the freedom to divulge all of the facts of the case in order to enable his attorney to prepare a complete defense." *In re Doe*, 101 Misc.2d 388, 420 N.Y.S.2d 996, 998 (N.Y.Sup.Ct.1979). *See also People v. Meredith*, 29 Cal.3d 682, 175 Cal.Rptr. 612, 631 P.2d 46, 51 (1981) ("Adequate legal representation in the ... defense of litigation compels a full disclosure of the facts by the client to his attorney.... Given the privilege, a client may make such a disclosure without

fear that his attorney may be forced to reveal the information confided to him.").

### C.

Third, the fifth amendment of the United States Constitution establishes that no person "shall be compelled in any criminal case to be a witness against himself[.]" This court has stated that the fifth amendment is a "keystone of 'our accusatory system of criminal justice [that] demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the ... expedient of compelling it from his own mouth.' " *State v. Russo*, 67 Haw. 126, 131, 681 P.2d 553, 558 (1984) (quoting *Miranda v. Arizona*, 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) (ellipsis in original).

A defense attorney serves a crucial role in the protection of the defendant's privilege against self-incrimination. Indeed, "[t]he position of the lawyer as a guardian of the accused's right against self incrimination is ... basic to modern criminal law jurisprudence[.]" *People v. Baldi*, 76 A.D.2d 259, 285, 429 N.Y.S.2d 677 (N.Y.App.Div.1980), *rev'd on other grounds by People v. Baldi*, 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981). Of course, this privilege "cannot be violated by [the defendant's] attorney." *People v. Belge*, 83 Misc.2d 186, 372 N.Y.S.2d 798, 802 (N.Y.Co.Ct.1975) (upholding attorney's decision not to disclose client's confession regarding unrelated murder). As the *Belge* court stated in regard to the attorney's role,

> the constitution ... attempts to preserve the dignity of the individual and to do that guarantees him the services of an attorney who will bring to the bar and to the bench every conceivable protection from the inroads of the state against such rights as are vested in the constitution for one accused of crime. *Among those substantial constitutional rights is that a defendant does not have to incriminate himself.*

*Id.* (emphasis added). Accordingly, counsel should not disclose reasons for seeking to engage in discussions with his or her client during court recesses. If an attorney is re-

quired to disclose or if inquiry by the court is made of the subject matter or the nature of the communication with his or her client, then, in effect, the attorney may be compelled to disclose what the defendant may not be compelled to disclose under the fifth amendment. *Id.* at 802–03.

## III.

With all due respect, the majority's grounds for disagreement with this opinion rests on several fundamental misstatements and misconceptions: (1) that because Petitioner chose to appear *pro se*, he has no basis to complain,[5] (2) that Petitioner handled much of his own trial without the need for standby counsel,[6] (3) that standby counsel acts only in an advisory capacity and accordingly Petitioner is not entitled to full representation,[7] (4) that nothing of consequence could occur in an attorney-client conference during a "minimal 15–minute" recess,[8] (5) that the issue is moot because the court advised Petitioner of what his counsel would have told him,[9] (6) that nothing significant would occur between Petitioner and counsel during a 15 minute recess, inasmuch as Peti-

tioner did not request a recess, did not object to, and did not express any concerns with the court's ban,[10] and (7) that it is absurd to treat the barring of an attorney client conference during an ordinary recess as reversible error.[11]

## A.

The majority's discussion of Petitioner's *pro se* status is irrelevant and inconsistent. The majority quotes *Faretta* for the proposition that "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel." Majority opinion at 369, 219 P.3d at 1156 (citations and quotation marks omitted). This contention is irrelevant because neither Petitioner nor his counsel argues that the quality of Petitioner's *pro se* representation amounted to a denial of effective assistance of counsel. What the majority misconceives is that whether counsel was ineffective is not the same question as whether the right to counsel was denied. The *Perry II* court

---

5. The majority quotes *Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), for the proposition that "[a] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel[,]" majority opinion at 369, 219 P.3d at 1156 (emphasis and internal quotation marks omitted), and also argues that it would be absurd to vacate "when [Petitioner] did not choose to utilize such right, but instead chose to represent himself," *id.* at 369–70, 219 P.3d at 1156–57 (emphasis omitted).

6. The majority argues that during trial Petitioner conducted opening statements, cross examination of witnesses, objections, his own testimony, and closing argument, "all with little assistance from Dennemeyer." *Id.* at 369, 219 P.3d at 1156. The majority also argues that Petitioner had a "candid nature and assertive conduct throughout the proceedings." *Id.* at 369, 219 P.3d at 1156.

7. According to the majority, a court may appoint standby counsel to assist a *pro se* defendant but such standby or advisory counsel "do[es] not actively participate in the trial, but act[s] in an advisory capacity[,]" *id.* at 369, 219 P.3d at 1156 (quoting *State v. Hirano,* 8 Haw.App. 330, 333 n. 5, 802 P.2d 482, 484 n. 5 (1990) (citing *Faretta,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562)) (brackets in original), and, therefore, "Dennemeyer did not represent [Petitioner] in the manner

of a full-time attorney but, instead, acted only in an 'advisory capacity[,]' " *id.* (citing *Hirano,* 8 Haw.App. at 333 n. 5, 802 P.2d at 484 n. 5).

8. The majority argues that "[g]iven [Petitioner's] conscious election to proceed *pro se,* it cannot be said that a minimal 15–minute deprivation of [Petitioner's] access to his standby counsel during a trial that spanned six days contributed to his ultimate conviction." *Id.* at 369, 219 P.3d at 1156.

9. The majority argues that "the trial court communicated the advice that [Petitioner's] standby counsel wanted to impart to [Petitioner during the 15–minute recess.]" *Id.* at 369, 219 P.3d at 1156.

10. The majority argues that there was no evidence that Petitioner had a "matter or concern" that he wanted to raise with Ms. Dennemeyer, *id.* at 369, 219 P.3d at 1156, such as evidence that Petitioner wished to speak to counsel, requested to a recess, or objected to the court's admonition, *id.* at 369, 370, 219 P.3d at 1156, 1157.

11. According to the majority, the "dissent's bright line rule" that any deprivations of a defendant's right to confer with counsel is harmful extinguishes discretion afforded to the trial courts. *Id.* at 370–71, 219 P.3d at 1157-58.

explicitly distinguished ineffective assistance of counsel from the denial of counsel stating, "[a]ctual or constructive denial of the assistance of counsel altogether, . . . is not subject to the kind of prejudice analysis that is appropriate in determining whether the quality of a lawyer's performance itself has been constitutionally ineffective." *Perry II*, 488 U.S. at 280, 109 S.Ct. 594 (internal quotation marks and citations omitted).

Contrary to the majority's statements, this case does not even raise the question of whether Petitioner's *pro se* performance was ineffective. Rather, this case involves "denial of the assistance of counsel altogether," *id.*, because the court violated Petitioner's right to counsel when it mandated that Petitioner not speak to his standby counsel at all during a routine recess. Thus, the majority's contention that a *pro se* defendant cannot complain about the quality of his own performance is puzzling and has no bearing at all in this case.

However, by arguing as it does, the majority also contradicts its own holdings in asserting that "it would be absurd to vacate [Petitioner's] convictions based on a violation of [Petitioner's] right to assistance of counsel, as the dissent implicitly suggests, when [Petitioner] did not choose to utilize such right, but chose to represent himself." Majority opinion at 369–70, 219 P.3d at 1156–57 (emphasis omitted). In this statement, the majority suggests that Petitioner does not have a right to Ms. Dennemeyer's assistance because he chose to represent himself. This suggestion contradicts its holdings 1) that "a criminal defendant has a constitutional right to confer with his or her counsel during a routine recess taken during trial proceedings, even when such recess is taken in the middle of the defendant's testimony[,]" *id.* at 368, 219 P.3d at 1155 (emphasis omitted), and 2) "that the trial court erred when it ordered [Petitioner] not to speak with his standby counsel during the 15–minute recess taken during his cross-examination[,]" *id.* at 368, 219 P.3d at 1155. The majority's position leaves only two options for the defendant: either give up the right to self-representation and utilize the right to counsel by employing full-time counsel, or continue *pro se* representation without the assistance of standby counsel. Consequently the majority's opinion directly clashes with the majority's holding that a criminal defendant has a constitutional right to speak with his or her standby counsel.

### B.

Second, the majority wrongly concludes that Petitioner handled much of his own trial without the need for standby counsel. What the majority ignores is that the trial transcripts demonstrate that Petitioner relied heavily on Ms. Dennemeyer throughout Petitioner's trial. Ms. Dennemeyer consulted with Petitioner and spoke to the jury during his opening statement.[12] Petitioner specifically requested to confer with Ms. Dennemeyer before Petitioner decided to testify on his behalf.[13] Ms. Dennemeyer made sugges-

---

**12.** Petitioner and Ms. Dennemeyer conferred four times during Petitioner's opening statement. The transcripts also reflect Ms. Dennemeyer spoke to the jury at the end of Petitioner's opening statement.

 MS. DENNEMEYER: All of that aside, the one point I wanted to ask you folks to keep an eye out for was trying to get [Petitioner] to remind you of is he's in a truck with a bench seat with a backpack, a fully loaded backpack in between the two of them.
 The witness is going to assert that he held a knife in one hand—I don't know which—that he was groping at her with another hand, and that at the same time he was kissing her breast. I'm asking you folks to keep an eye on how is that physically possible? If there's a backpack in between them, one hand is tied up, the other hand is tied up, how could he

have done that? That's all I wanted to ask you to look for. Thank you.

**13.** Before testifying, Petitioner asked to speak with his standby counsel.

 THE COURT: ... [Petitioner], at the beginning of the trial, the [c]ourt informed you [sic] have your constitutional right to take the stand and to testify, and the [c]ourt advised you that the decision to testify is yours to make.
 And you do have stand-by counsel, and so you should confer with stand-by counsel as to whether or not you will be testifying in this case.
 ....
 [Petitioner], you indicated at the beginning of the trial that you understood your rights. Do you understand your rights at this time?
 [PETITIONER]: Yes.

tions to Petitioner while he was testifying on direct examination.[14] Ms. Dennemeyer frequently objected to Respondent's cross-examination when Petitioner was on the stand. Ms. Dennemeyer objected to the jury instructions.[15] Furthermore, Petitioner followed Ms. Dennemeyer's advice. Hence, the majority incorrectly characterizes Petitioner as exhibiting "assertive conduct throughout the proceedings." Majority opinion at 369, 219 P.3d at 1156. Indeed, the transcripts reflect that on his cross-examination, Petitioner was far from assertive. Petitioner was often confused throughout Respondent's cross-examination, and was repeatedly reminded by the court not to answer when Ms. Dennemeyer objected.[16] Obviously, Petition-

> THE COURT: And, [Petitioner], what is your decision as to whether you will be taking the stand to testify or not?
> [PETITIONER]: May I speak with my stand-by counsel first before I make a decision?
> THE COURT: Certainly. Yes, you may.
> (At which time [Petitioner] and [Ms. Dennemeyer] conferred privately)
> THE COURT: [Petitioner], for the record, have you had an opportunity to confer with your stand-by counsel?
> [PETITIONER]: Yes.
> THE COURT: And have you made a decision made [sic] as to whether you'll be taking the stand?
> [PETITIONER]: I will be taking the stand.
> (Emphasis added.)

14. As Petitioner was finishing his narrative on direct examination, Ms. Dennemeyer counseled Petitioner on his direct examination.

> MS. DENNEMEYER: May I approach, your honor?
> THE COURT: Excuse me. Does that conclude your statement, [Petitioner]?
> [PETITIONER]: That's what went happen.
> THE COURT: Does that conclude your statement?
> MS. DENNEMEYER: Before he concludes, I wanted to approach to talk to him.
> [PETITIONER]: Yeah, please.
> THE COURT: Ms. Dennemeyer.
> MS. DENNEMEYER: Is there—can you see it?
> [PETITIONER]: Yeah.
> MS. DENNEMEYER: You never talked about it. Maybe you want to go back and break down the incident of the scene more closely.
> [PETITIONER]: Okay.
> I had asked Ms. Dennemeyer to put—what you call it? The sketching up because this is the best view of the marine camp crime scene.
> [Petitioner's direct continues]
> (Emphases added.)

15. Ms. Dennemeyer objected to Respondents's proposed jury instructions.

> THE COURT: Okay. I'd like to move to the State's proposed instructions. And looking at State's instruction one, do we have an agreement?
> [DPA]: Yes
> [PETITIONER]: Yes
> THE COURT: Number two, do we have agreement?
> [DPA]: Yes.

> [PETITIONER]: Yes.
> MS. DENNEMEYER: This—well, he's agreeing to their—this is what I would enter objection. I believe that the first one, two, three—there's three identical instructions, and there's more of the same instruction later on. So I object to the repeating of the instruction—or [Petitioner], I guess, is objecting if you feel that way. If you don't, that's okay.
> THE COURT: [Petitioner], your position.
> [PETITIONER]: Yes, I'm going to object also.
> ....
> THE COURT: ... Number seven.
> MS. DENNEMEYER: Same objection.
> THE COURT: [Petitioner], I just need for you to respond on the record as well.
> [PETITIONER]: I agree with Ms. Dennemeyer[.]

16. The court repeatedly reminded Petitioner to stop speaking when Ms. Dennemeyer objected. For example:

> [DPA]: Q. Is it coincidence that right where she claims you attacked her the second time, there's her backpack and sandals?
> [PETITIONER]: A. No, there is no coincidence. I didn't attack her any first time, second time. I just told you. I cannot explain to you one more time. I grabbed when I turned—
> [DPA]: Objection; nonresponsive to that specific question, your Honor. I'm going to move to strike.
> [PETITIONER]: No
> THE COURT: Sustained. [Petitioner].
> [PETITIONER]: No.
> THE COURT: Just a minute. Just a minute.
> [PETITIONER]: No, it's wrong. You're wrong.
> THE COURT: [Petitioner], as I instructed you earlier, whenever there's an objection, you are to stop speaking.
> ...
> [DPA]: Q. Is it a coincidence that right where she claims she had to drop her bag and take off her shoes to escape from you the second time that's right where the bag and shoes are; is that a coincidence?
> MS. DENNEMEYER: Objection; asked and answered.
> [PETITIONER]: No, it's not a coincidence.
> THE COURT: [Petitioner], once again when there's an objection, please do not answer.

er was "unfamiliar with the rules of evidence.... [He] lack[ed] both the skill and knowledge adequately to prepare his defense, even though he [may] have [had] a perfect one. He require[d] the guiding hand of counsel at every step of the proceedings against him." *Perry II,* 488 U.S. at 286, 109 S.Ct. 594 (quoting *Powell v. Alabama,* 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932)) (quotation marks omitted). The majority's suggested curtailment of this attorney-client relationship during a routine recess disregards Petitioner's obvious legal need for counsel.

### C.

Third, the majority mistakenly believes that standby counsel acts only in an advisory capacity, and, accordingly, Petitioner is not entitled to otherwise obtain counsel's help. In arriving at this conclusion the majority 1) misstates the law in deciding that standby counsel can only act in an advisory capacity, 2) fails to recognize that the court, in its discretion, allowed hybrid-representation and therefore Ms. Dennemeyer did actively participate in trial, and 3) again contradicts its holding that defendants are entitled to consult with their standby counsel during a routine recess.

The majority's reliance on note 5 of *Hirano,* 8 Haw.App. at 333 n. 5, 802 P.2d at 484 n. 5, citing *Faretta, supra,* for the proposition that "standby or advisory counsel 'do[es] not actively participate in the trial, but act[s] in an advisory capacity[,]'" is inaccurate. To the contrary, *Faretta's* only discussion of standby counsel acknowledges that "[a] State may-even over objection by the accused-appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Faretta,* 422 U.S. at 806 n. 46, 95 S.Ct. 2525. The majority's assertion is a misstatement of the law because *Faretta* allows standby counsel to actively participate at trial to aid the accused when help is requested.

(Emphases added.)

In *Hirano,* the court was confronted with the issue of whether a criminal defendant had a constitutional right to appear as *pro se* co-counsel. 8 Haw.App. at 332, 802 P.2d at 484. "Writers have labeled such an arrangement as 'hybrid representation.'" *Id.* at 333, 802 P.2d at 484 (quoting 2 W. LaFave & J. Israel, Criminal Procedure § 11.5(f) (1984)). *Hirano* held that the right to proceed as *pro se* co-counsel is not guaranteed under the federal or state constitutions. *Id.* However, *Hirano* did not preclude such hybrid representation. Instead *Hirano* left open the possibility for hybrid representation as "[s]uch representation is in the discretion of the trial court." *Id.* at 336, 802 P.2d at 485.

In this case, unlike in *Hirano,* Petitioner requested to represent himself *pro se* rather than *pro se* co-counsel. The court, in its proper discretion, appointed Ms. Dennemeyer as standby counsel and apparently allowed Petitioner to have hybrid representation. A review of the transcript demonstrates that Ms. Dennemeyer was obviously more than an advisor. As discussed previously, Ms. Dennemeyer consulted with Petitioner and spoke to the jury during opening statement, made suggestions to Petitioner while on direct examination, frequently objected to Respondent's cross-examination, and objected to jury instructions. Ms. Dennemeyer acted as full-time counsel at several key periods of Petitioner's trial.

The majority has not cited any authority for the proposition that a defendant's right to speak to standby counsel or hybrid counsel during a routine recess can be abrogated. The fact that standby counsel was appointed in this case evinces the court's belief that Petitioner could not adequately represent himself. The majority again implies that since Petitioner was *"pro se,"* he was entitled only to advice from standby counsel. Majority opinion at 368–69, 219 P.3d at 1155–56. This position *again contradicts the majority's* own holdings. Petitioner had the right to speak to Ms. Dennemeyer during a routine recess regardless of whether Ms. Dennemeyer was standby, hybrid, or regular counsel.

## D.

Fourth, the majority argues that nothing of consequence could occur in an attorney-client conference during a "minimal 15–minute" recess. A time limit, as drawn by the majority, would be arbitrary. As Justice Marshall in his dissent argued, "it defies common sense to argue that attorney-defendant conversations regarding the availability of other witnesses, trial tactics, or even the possibility of negotiating a plea bargain . . . cannot, or do not, take place during relatively brief recesses." *Perry II*, 488 U.S. at 294, 109 S.Ct. 594 (Marshall, J. dissenting, joined by Brennen, J. and Blackmun, J.) (internal quotation marks and citations omitted). For example, a defendant on the stand "may remember the name or address of a witness, or the location of physical evidence which would be helpful to his defense. *It would take mere seconds to convey this information to counsel.*" *Id.* (emphasis added). Additionally, it would only take seconds for a defendant to convey to his lawyer that he has concluded that "he should attempt plea negotiations with the prosecution or accept an outstanding plea bargain offer." *Id.* These opportunities "might be lost forever, however, if a bar order issues." *Id.*

Within a 15–minute recess, a defendant may well have questions in regard to matters unrelated to the testimony he was giving at the time the recess was taken. A defendant could seek to ask his or her counsel about testimony which would in turn alert counsel that the defendant's privilege against self-incrimination was implicated. The majority's reliance on "the [court's] admonishment to [Petitioner,]" majority opinion at 368–69, 219 P.3d at 1155–56, does not account for what Petitioner might have wanted to say to his counsel during a short recess. Defendants may not be cognizant of an issue that would arise in the context of a discussion with their attorneys before meeting with them. The majority seemingly ignores the fact that matters of legal consequence that were not considered the subject of pre-recess "concerns" may arise during the recess meeting simply as a result of contact between attorney and client.

## E.

Fifth, the majority mistakenly believes that this issue is moot because the court advised Petitioner of what his counsel would have told him. Majority opinion at 369, 219 P.3d at 1157. This reasoning is flawed because in examining the reason offered by Petitioner's counsel to determine that the court's error was "harmless," the majority intrudes upon the privilege held by a defendant with respect to information conveyed to or from his or her attorney. In essence, the majority's approach condones the disclosure of information through the defendant's attorney that would otherwise be confidential. Such an approach undermines the principle of "full and frank communication" protected by the attorney client privilege under HRE Rule 503(b). *See Save Sunset Beach*, 102 Hawai'i at 484, 78 P.3d at 20.

Thus, in examining the reasons for conferring with a client during a trial recess, the majority directs that the nature of the information or communication, *i.e.*, "concerns," majority opinion at 370, 219 P.3d at 1158, must be disclosed in order to determine whether a trial court's decision to prohibit discussions between an attorney and the defendant was harmless or not. But the nature of the information, "objection," *id.* at 369, 371, 219 P.3d at 1156, 1158 or "concern," *id.* at 369, 371, 219 P.3d at 1156, 1158, if disclosed, might itself incriminate the defendant. *See State v. Kamanao*, 103 Hawai'i 315, 321, 82 P.3d 401, 407 (2003) (citing *State v. Shreves*, 313 Mont. 252, 60 P.3d 991, 995 (2002)) for the proposition that "[t]he privilege against self incrimination does not turn upon the type of proceeding in which its protection is invoked, but [rather,] upon the nature of the statement or admission and the exposure which it invites") (internal quotation marks omitted); *State v. Kupihea*, 80 Hawai'i 307, 313, 909 P.2d 1122, 1128 (1996) (stating that "the privilege against self incrimination extends not only to answers that would in themselves support a conviction, but to those that would furnish a link in the chain of evidence needed to prosecute" (quoting *Territory v. Lanier*, 40 Haw. 65, 72 (1953)).

The majority's view could also lead to fifth amendment violations because "[t]he criminal

defendant's self-incrimination rights become completely nugatory if compulsory disclosure can be exacted through his attorney[,]" *Belge,* 372 N.Y.S.2d at 802 (internal quotation marks omitted), or if a defendant is required to voice some objection, majority opinion at 368, 369, 370, 219 P.3d at 1155, 1156, 1157, specifically request the opportunity to speak to counsel, *id.* at 368, 369, 219 P.3d at 1155, 1156, or express on the record a "concern[,]" *id.* at 368, 219 P.3d at 1155, in order to convince a trial court that a meeting between attorney and client should be permitted during a routine recess. *See Commonwealth v. Stenhach,* 356 Pa.Super. 5, 514 A.2d 114, 117–18 (1986) (stating that "[t]he right not to be compelled in any criminal case to be a witness against himself would be empty if defense counsel, repeating information provided by a client, acted as a witness against him"). Thus, in addition to violating the attorney-client privilege, the majority's approach infringes on defendants' fifth amendment privilege against self-incrimination.

### F.

Sixth, the majority erroneously asserts that nothing significant would have occurred between Petitioner and Ms. Dennemeyer during the 15–minute recess because Petitioner did not request a recess, and did not object to or express any concerns with the court's ban. The majority concludes that "there was no evidence in the record or identified during oral argument before this court that [Petitioner] did, in fact, have a 'matter or concern' that he wanted to raise with [Ms.] Dennemeyer." Majority opinion at 369, 219 P.3d at 1156. According to the majority, "the speculatory assertion that [Petitioner] 'may have wished to discuss an issue with his court appointed counsel' during the recess, ... is insufficient ... to show that the [court's] error contributed to [Petitioner's] ultimate conviction." *Id.* at 369, 219 P.3d at 1156 (brackets omitted).

The majority reaches this conclusion despite the fact that it "agree[s]," *id.* at 365, 219 P.3d at 1152, with Justice Marshall's statement that "[n]owhere have we suggested that the Sixth Amendment right to counsel *turns on what the defendant and his attorney discuss* or at what point during a trial their discussion takes place." *Perry II,* 488 U.S. at 291, 109 S.Ct. 594 (emphasis added). Indeed, Justice Marshall pointed out that the need for attorney and defendant discussions during a trial recess works both ways; that is, while the defendant's attorney may want to discuss certain issues with the defendant during a recess, the defendant may have an equal desire to discuss certain issues with his or her attorney during a recess or may have questions with respect to counsel's advice. *See id.* at 294, 109 S.Ct. 594.

The majority cites to no authority for the proposition that there needs to be "evidence in the record" to show that a defendant must "have a matter or concern that he wanted to raise with" his or her counsel in order to establish that there was a reasonable possibility that the court's "constitutional error" of preventing discussions during a routine trial recess contributed to the defendant's conviction. *See* majority opinion at 367, 219 P.3d at 1154. Indeed, it is difficult to imagine how such "evidence" could be provided, because a defendant's trial counsel would not know beforehand whether the defendant had an issue that he or she wished to discuss during a recess. Defendants themselves would not know that they are required to object, express concern, or state for the record that they have an issue they would like to discuss with their attorneys, or trusting in the confidentiality of the attorney-client privilege would not volunteer in court the reason for conferring during the recess.

When a court prevents a defendant from speaking with his or her attorney during a routine trial recess, it deprives the defendant of the opportunity to discuss matters he or she may want to raise with the attorney, some examples of which have been noted above. This deprivation occurs regardless of whether there is "evidence in the record" to establish that the defendant wanted to engage in such discussions. The constitutional right to counsel guarantees defendants an opportunity for dialogue, and nowhere is it required that defendants provide affirmative evidence of their desire to avail themselves of

this right. Thus, while Petitioner may not have affirmatively requested to speak to Ms. Dennemeyer on the record, that in itself does not establish that nothing of legal consequence would have been communicated between Petitioner and counsel during the recess.

Despite its disavowal, majority opinion at 369–70, 219 P.3d at 1156–57, the majority, by grounding its analysis in what Petitioner's counsel apparently wanted to say to Petitioner, incorrectly implies that it is appropriate to delve into the reasons for communications between an attorney and his or her client in order to gauge whether barring such communication during an ordinary recess was "harmless." As explained above, this approach is in derogation of the right to counsel, the attorney-client privilege and the right against self-incrimination.

## G.

### 1.

Finally, the majority wrongly asserts that it is "absurd" that the barring of the attorney-client conference during an ordinary recess is reversible error. *Id.* at 370, 219 P.3d at 1157. The majority misrepresents this opinion as establishing a "bright line" rule that "*any* deprivation of a defendant's right to confer with counsel is harmful," *id.* at 370, 219 P.3d at 1157 (emphasis in original), and maintains that this "bright line" approach leads to three absurd results—"[r]ever[sal of] a defendant's conviction based on a violation of his right to confer with counsel, even where the defendant expressly states there is no need for such communication," *id.* at 370, 219 P.3d at 1157,[17] "[r]evers[al of] conviction where [Petitioner] never asked to confer with Dennemeyer nor objected to or expressed any concerns regarding the court's admonition not to confer with counsel during the routine 15–minute recess," *id.* at 370, 219 P.3d at 1157,[18] and "extinguish[ment of] the

discretion afforded to the trial courts," [19] *id.* at 370, 219 P.3d at 1157.

The underlying fallacy of the majority's opinion is that, contrarily, both the majority and dissent in *Perry II* indicated that a showing of prejudice is not required. In *Geders*, the United States Supreme Court (Supreme Court) addressed the question of "whether a trial court's order directing [a criminal defendant] not to consult his attorney during a regular overnight recess, called while [the defendant] was on the stand as a witness and shortly before cross-examination was to begin, deprived him of the assistance of counsel in violation of the Sixth Amendment." 426 U.S. at 81, 96 S.Ct. 1883. In a concurring opinion, Justice Marshall, joined by Justice Brennan, explained that, under the majority's holding, "a defendant who claims that an order prohibiting communication with his [or her] lawyer impinges upon his [or her] Sixth Amendment right to counsel need not make a preliminary showing of prejudice." *Id.* at 92, 96 S.Ct. 1883 (Marshall, J., concurring, joined by Brennan, J.)

Eleven years later, in *Perry II,* the Supreme Court again considered the question of whether a trial court's order prohibiting a criminal defendant from conferring with defense counsel constituted an impermissible violation of the sixth amendment. In *Perry II,* the primary question was whether the defendant needed to show that the denial of counsel prejudiced the defendant in order to have his conviction set aside. 488 U.S. at 286, 109 S.Ct. 594 (Marshall, J., dissenting, joined by Brennen, J. and Blackmun, J.). The district court granted the defendant's writ for habeas corpus determining that the defendant "had a right to counsel during a brief recess and *he need not demonstrate prejudice from the denial* of that right in order to have his conviction set aside." *Id.* at 276, 109 S.Ct. 594 (emphasis added) (citation omitted). The Court of Appeals of the

---

17. Such a case bereft of surrounding circumstances is not before this court. But tellingly, the majority creates a hypothetical situation that again underscores its misperception about a defendant's right to counsel. As indicated *supra,* the majority's posed inquiry would violate a defendant's right to counsel and attorney-client

privilege and risk violation of the right against self-incrimination.

18. This contention was addressed *supra.*

19. *See* discussion *infra.*

Fourth Circuit in an en banc panel reversed the district court, determining that, although a constitutional error had occurred, the error was not prejudicial. *Id.* Four judges, however dissented on the prejudice analysis, reasoning that "the prejudice inquiry was particularly inappropriate in this context *because it would inevitably require a review of private discussions between client and lawyer.*" *Id.* (emphasis added).

On certiorari before the Supreme Court, the majority held that no constitutional error had occurred; however the majority could not "accept the rationale of the Court of Appeals' [majority] decision" with regard to the Fourth Circuit's holding that the error was not prejudicial. *Id.* at 280, 109 S.Ct. 594. The Supreme Court reaffirmed that "a showing of prejudice was not an essential component" to reverse a defendant's conviction when the defendant was denied access to his lawyer. *Id.* at 278–79, 109 S.Ct. 594. The majority stated:

> There is merit in petitioner's argument that a showing of prejudice is not an essential component of a violation of the rule announced in Geders. In that case, we simply reversed the defendant's conviction without pausing to consider the extent of the actual prejudice, if any, that resulted from the defendant's denial of access to his lawyer during the overnight recess.

*Id.* (emphasis added). The Supreme Court also noted that "reversal [without prejudice] was consistent with the view we have often expressed concerning the fundamental importance of the criminal defendant's constitutional right to be represented by counsel." *Id.* at 280, 109 S.Ct. 594. *See, e.g., Cronic,* 466 U.S. at 653–54, 104 S.Ct. 2039; *Chapman v. California,* 386 U.S. 18, 23, n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

Justice Marshall, dissenting in *Perry II,* also agreed that the denial of the assistance of counsel during a critical stage of the criminal proceeding warranted a reversal without any proof of prejudice. *Perry II,* 488 U.S. at 278–79 n. 7, 109 S.Ct. 594 (Marshall, J. dis-

senting, joined by Brennen, J. and Blackmun, J.). Justice Marshall noted that

> [f]ew categories of constitutional error so undermine the adversary system as to *warrant reversal without any proof of prejudice in a particular case. Denial of the assistance of counsel during a critical stage of criminal proceedings is one such category of error.* Whether the deprivation of counsel spans an entire trial or but a fraction thereof, it renders suspect any result that is obtained.

*Id.* (quoting *Perry I,* 832 F.2d at 849 (Winter, C.J., dissenting)) (emphasis added).

Indeed, Hawai'i courts have recognized that the Hawai'i Constitution protects certain rights "so basic to a fair trial that its contravention can never be deemed harmless." *State v. Holbron,* 80 Hawai'i 27, 31 n. 12, 904 P.2d 912, 918 n. 12 (1995) (quoting *State v. Suka,* 79 Hawai'i 293, 300, 901 P.2d 1272, 1279 (App.1995)); *see also State v. Bowe,* 77 Hawai'i 51, 881 P.2d 538 (1994) (holding that use of a coerced confession in criminal trial would be fundamentally unfair).

### 2.

In arriving at its holdings, the majority agrees with the reasoning of Justice Marshall's dissent in *Perry II.* The majority admits that "[w]e are persuaded by the reasoning of the [*Perry II* ] dissent [by Justice Marshall,]" majority opinion at 365–67, 219 P.3d at 1153–54, and agrees with Justice Marshall's proposition that "**any** order barring communication between a defendant and his attorney, at least where the communication would not interfere with the orderly and expeditious process of the trial," violates a criminal defendant's state constitutional right. *Id.* at 63–64, 881 P.2d 538 (quoting *Perry II,* 488 U.S. at 285, 109 S.Ct. 594 (Marshall, J., dissenting, joined by Brennan, J., and Blackmun, J. (emphasis in original))).

However, both Justice Marshall's dissent, as well as the majority in *Perry II,* recognized that a showing of prejudice was not required as part of a claim of denial of counsel. As noted *supra,* Justice Marshall maintained that the "denial of the assistance of counsel during a critical stage of the criminal proceeding" "warrants a reversal without any

proof of prejudice." *Perry II*, 488 U.S. at 278–79 n. 7, 109 S.Ct. 594 (Marshall, J. dissenting, joined by Brennen, J. and Blackmun, J.) (quoting *Perry I*, 832 F.2d at 849 (Winter, C.J., dissenting)).

Unlike both the *Perry II* majority and Justice Marshall's dissent, the majority requires that there be affirmative evidence in the record to support a finding that Petitioner needed to speak to his counsel during a routine recess. The majority mandates a showing that Petitioner "requested a recess" or "objected to" the trial court's admonition when the court prohibited communication, majority opinion at 371, 219 P.3d at 1158, and thus, that prejudice existed. This mandate directly conflicts with both the ruling of the *Perry II* majority and the dissent by Justice Marshall. The majority's requirement of prejudice even contradicts the majority's own adoption of Justice Marshall's dissent.

### 3.

Again, the majority erroneously argues that under this opinion, a defendant who repeatedly asks to confer with his counsel while testifying and whose requests are denied by the court would be entitled to a *per se* reversal or vacation of his conviction. *Id.* at 369–70, 219 P.3d at 1156–57. Contrary to the majority's assertions, this opinion does not extinguish the discretion afforded to the court. As stated previously, "any order barring communication between a defendant and his attorney, at least where that communication would not interfere with the orderly and expeditious progress of trial," *Perry II*, 488 U.S. at 285, 109 S.Ct. 594 (Marshall, J., dissenting, joined by Brennen, J. and Blackmun, J.), violates a criminal defendant's constitutional right to counsel. As Justice Marshall indicated, a trial court has due discretion to determine whether a recess should be taken in light of the trial court's control over the orderly and expeditious progress of trial.[20] With all due respect, the majority's argument is simply off the mark.

20. Of course, the question of the denial of counsel during a non-routine recess is a question not presented by this case, inasmuch as the only

### IV.

The majority's approach in this case infringes upon a defendant's right to be represented by counsel at every "critical stage" of the trial and undermines the attorney-client privilege and defendants' fifth amendment rights. For the foregoing reasons, I dissent to this part of the majority's opinion.

issue before us is whether Petitioner was prevented from talking to his counsel during a *routine* recess.